UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

COMMODITY FUTURES TRADING
COMMISSION,

               Plaintiff,                    Case No.: 20-1657

               v.

                                 Hon._____

HIGHRISE ADVANTAGE, LLC, BULL
RUN ADVANTAGE, LLC, GREEN
KNIGHT INVESTMENTS, LLC, KING
ROYALTY LLC, SR&B INVESTMENT
ENTERPRISES, INC., AVINASH SINGH,
RANDY ROSSEAU, DANIEL
COLOGERO, HEMRAJ SINGH, and
SURUJPAUL SAHDEO,
                  Defendants.

**COMPLAINT AGAINST HIGHRISE ADVANTAGE, LLC; BULL RUN
ADVANTAGE, LLC; GREEN KNIGHT INVESTMENTS, LLC; KING ROYALTY
LLC; SR&B INVESTMENT ENTERPRISES, INC.; AVINASH SINGH; RANDY
ROSSEAU; DANIEL COLOGERO; HEMRAJ SINGH; AND SURUJPAUL SAHDEO,
FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES,
AND OTHER EQUITABLE RELIEF**

Plaintiff Commodity Futures Trading Commission ("Commission" or "CFTC"), an

independent federal agency, by and through its attorneys, hereby alleges as follows:

## I. SUMMARY

1.     Beginning in or around February 2013 and continuing to the present

("Relevant Period"), Avinash Singh ("Singh") and his company Highrise Advantage, LLC

("Highrise"), Randy Rosseau ("Rosseau") and his company Bull Run Advantage, LLC ("Bull

Run"), Daniel Cologero ("Cologero") and his company Green Knight Investments, LLC

("Green Knight"), Hemraj Singh ("Raj") and his company King Royalty LLC, ("King

Royalty") and Surujpaul Sahdeo ("Sahdeo") and his company SR&B Investment Enterprises, Inc. ("SR&B"), (collectively, "Defendants"), have solicited and accepted at least $4,750,000 from at least 150 participants ("pool participants"), in connection with pooled investments in retail foreign currency contracts ("forex"). Pool participants deposited funds directly into the Highrise master commodity pool ("Master Pool") or into one of four "feeder" pools (Bull Run, Green Knight, King Royalty, and SR&B) (collectively, "Feeder Pools") that funneled most of the deposits they received to the Master Pool.

2.      Rather than use all of pool participants' funds to trade forex in the Master Pool, Singh and Highrise traded only a small portion and instead misappropriated over $3 million of pool participants' funds to pay for personal expenses and to make Ponzi-type payments to other pool participants, in addition to payments to feeder fund entities.

3.      Because Highrise, Green Knight, SR&B, King Royalty, and Bull Run (collectively, "Corporate Defendants") solicited funds for the purpose of trading forex in pooled accounts, each acted as a commodity pool operator ("CPO") while operating a commodity pool in its own name. At no time during the Relevant Period were any of the Corporate Defendants registered with the CFTC as CPOs. Defendants Singh, Cologero, Sahdeo, Raj, and Rosseau (the "Individual Defendants") acted as Associated Persons ("APs") of their respective CPOs by soliciting participation in their respective commodity pools. The Individual Defendants were likewise not registered as APs of their respective CPOs during the Relevant Period.

4.      As part of the fraudulent scheme, Highrise issued monthly account statements to pool participants that directly participated with Highrise as well as to the pool participants

2

of at least one Feeder Pool, which misrepresented the profits and balances of the pool participants' respective interests in the Master Pool.  Green Knight, Bull Run, and King Royalty likewise each issued monthly account statements to their pool participants that misrepresented the profits and balances of the pool participants' respective interests in the Feeder Pools, as well as the Master Pool.

5.      By engaging in this conduct and the conduct further described herein, Defendants engaged, are engaging, or are about to engage in acts and practices in violation of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1-26 (2018), and accompanying CFTC regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2019).

6.      Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

7.      Accordingly, the Commission brings this action pursuant to Sections 6c(a) and 2(c)(2)(C)(vii) of the Act, 7 U.S.C. §§ 13a-1, 2(c)(2)(C)(vii) (2018), to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act and Regulations, and to enjoin them from engaging in any commodity interest-related activity.

8.      In addition, the Commission seeks civil monetary penalties, restitution and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, pre- and post-judgment interest, rescission, and such other and further relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), authorizes the Commission to seek injunctive relief against any person whenever it shall appear that such person has engaged, is engaging, or is about to engage in any act or practice that violates any provision of the Act or any rule, regulation, or order promulgated thereunder.  Section 2(c)(2)(C)(vii) of the Act, 7 U.S.C. § 2(c)(2)(C)(vii) (2018), provides the CFTC with jurisdiction over the forex solicitations and transactions at issue in this action.

10.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018), because Defendant Singh is found in and inhabits the Middle District of Florida, all Defendants have transacted business in this District, and the acts and practices in violation of the Act and Regulations have occurred, are occurring, or are about to occur within this District.

## III.     PARTIES

11.     Plaintiff **Commodity Futures Trading Commission** (**"CFTC"** or **"Commission"**) is the independent federal regulatory agency charged with the administration and enforcement of the Commodity Exchange Act, 7 U.S.C. §§ 1-26 (2018), and Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2019).  The Commission maintains its principal office at 1155 21st Street NW, Washington, DC 20581, although this

action is being prosecuted through its Chicago Regional Office at 525 West Monroe Street, Suite 1100, Chicago, Illinois 60661.

12.     Defendant **Highrise Advantage, LLC ("Highrise")** is a Florida limited liability company with its business address in Orlando, Florida.  Highrise's articles of organization were filed with the State of Florida on February 13, 2013.  Highrise has never been registered with the Commission in any capacity.

13.     Defendant **Avinash Singh ("Singh")** is the founder, registered agent, principal member, and manager of Highrise Advantage, LLC.  Singh is a resident of Saint Cloud, Florida.  Singh opened at least 12 bank accounts in Highrise's name, in at least seven different financial institutions, and is the sole signatory on the bank and trading accounts in the name of Highrise.  Singh has never been registered with the Commission in any capacity.

14.     Defendant **Green Knight Investments, LLC ("Green Knight")** is a Florida limited liability company with its business address in Kissimmee, Florida.  Green Knight's articles of organization were filed with the State of Florida on August 11, 2016.  Green Knight has never been registered with the Commission in any capacity.

15.     Defendant **Daniel Cologero ("Cologero")** is the registered agent, manager, owner and operator of Green Knight.  Cologero is a resident of Kissimmee, Florida.  He solicited and accepted funds from pool participants for participation in the Green Knight Pool and transferred some of those funds to Highrise.  He is a signatory on Green Knight bank accounts.  Cologero has never been registered with the Commission in any capacity.

16.     Defendant **SR&B Investment Enterprises, Inc**. **("SR&B")** is a Florida limited liability company with its business address in Miramar, Florida.  SR&B's articles of

organization were filed with the State of Florida on February 18, 2009.  SR&B has never been registered with the Commission in any capacity.

17.     Defendant **Surujpaul Sahdeo ("Sahdeo")** is the registered agent, principal and the president of **SR&B**.  Sahdeo is a resident of Miramar, Florida.  Sahdeo solicited and accepted funds from pool participants for participation in SR&B and transferred some of those funds to Highrise.  Sahdeo is the sole signatory on at least four of SR&B's eight known bank accounts.  Sahdeo has never been registered with the Commission in any capacity.

18.     Defendant **King Royalty LLC ("King Royalty")** is a New Jersey limited liability company with its business address in Jersey City, New Jersey.  King Royalty's articles of organization were filed with the State of New Jersey on May 8, 2013.  King Royalty has never been registered with the Commission in any capacity.

19.     Defendant **Hemraj Singh ("Raj")** is the registered agent, principal and the president of King Royalty.  Raj is a resident of Jersey City, New Jersey.  He solicited and accepted funds from pool participants for participation in King Royalty and transferred some of those funds to Highrise.  He is the sole signatory on King Royalty's bank accounts.  Raj has never been registered with the Commission in any capacity.

20.     Defendant **Bull Run Advantage, LLC ("Bull Run")** is a Florida limited liability company with its business address in Melbourne, Florida.  Bull Run's articles of organization were filed with the State of Florida on November 8, 2017.  Bull Run has never been registered with the Commission in any capacity.

21.     Defendant **Randy Rosseau ("Rosseau")** is the registered agent, principal and the manager of Bull Run.  He is a resident of Melbourne, Florida.  He solicited and accepted

funds from pool participants for participation in Bull Run and transferred some of those funds to Highrise. Rosseau is the sole signatory on Bull Run's bank accounts. Rosseau has never been registered with the Commission in any capacity.

### IV.   OTHER RELEVANT ENTITY

22.   **Amaya & Company, LLC ("Amaya")**, d/b/a Piptionary Club, is a Florida limited liability company with its business address in Kissimmee, Florida. Amaya's articles of organization were filed with the State of Florida on February 6, 2013. According to documents on file with the State of Florida, Division of Corporations, Amaya's registered agent is Shanaz A. Singh; Shanaz A. Singh is the wife of Defendant Avinash Singh. On information and belief, Amaya was one of several entities Highrise used to solicit funds from the public. Amaya has never been registered with the Commission in any capacity. The website https://piptionaryclub.com is a site operated by Amaya. The Piptionary Club claims to offer "Consistent Profit from Your Forex Trades". The website www.mql5.com/en/users/highrise is also associated with Piptionary Club and Singh, and has references to Avinash Singh and The Piptionary Club. Through this website, the Piptionary Club claims to offer "a complete 'hands off' approach to Forex trading that produces consistent profits." It further claims that "this is a very simply trading system that you may follow for EXPONENTIAL GROWTH on your account." Through these websites, the Piptionary Club, offers trade signals and auto-trader services that purported to assist customers by providing recommendations as to specific forex trades.

## V.      STATUTORY BACKGROUND

### A.      Statutory and Regulatory Requirements Related to Forex Fraud

23.      Section 1a(10) of the Act, 7 U.S.C. § 1a(10) (2018), in relevant part, defines a "commodity pool" as any investment trust, syndicate or similar form of enterprise operated for the purpose of trading commodity interests, including any agreement, contract or transaction in foreign currency described in Section 2(c)(2)(C)(i) of the Act.

24.      Section 1a(11) of the Act, 7 U.S.C. § 1a(11)(A)(i) (2018), defines a "commodity pool operator" ("CPO") as any person engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in commodity interests.  With regard to retail forex transactions, Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2019), defines a CPO as any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an eligible contract participant and that engages in retail forex transactions.

25.      Regulation 4.10 (c), 17 C.F.R. § 4.10 (c) (2019), defines a "participant" as any person that has any direct financial interest in a pool.

26.      Regulation 4.20(a)(1), 17 C.F.R. § 4.20(a)(1) (2019), provides, with certain specified exceptions and exemptions not applicable here, that a CPO must operate its pool as an entity cognizable as a legal entity separate from that of the pool operator.

27.      Regulation 4.20(b), 17 C.F.R. § 4.20(b) (2019), provides that all funds, securities or other property received by a CPO from an existing or prospective pool

participant for the purchase of an interest . . . in a pool that it operates or that it intends to operate must be received in the pool's name.

28.     An eligible contract participant ("ECP") is generally defined in Section la(l8) of the Act, 7 U.S.C. § la(l8)(xi) (2018), as an individual who has total assets in an amount in excess of (i) $10 million or (ii) $5 million and who enters into the transaction to manage risk.

29.     Regulation 1.3, 17 C.F.R. § 1.3 (2019), defines an "Associated Person" or AP of a CPO as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves:  (i) the solicitation of funds, securities or property for participation in a commodity pool or (ii) the supervision of any person or persons so engaged.

30.     Section 2(c) of the Act, 7 U.S.C. § 2(c) (2018), delineates the Commission's jurisdiction over agreements, contracts and transactions in forex.  Specifically, 7 U.S.C. § 2(c)(2)(C)(vii) provides that the Commission shall have jurisdiction over an account or pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency described in clause 2(c)(2)(C)(i).  In addition, 7 U.S.C. § 2(c)(2)(C)(i)(I), in relevant part, applies to, any agreement, contract or transaction in foreign currency that is offered to, or entered into with, a person that is not an ECP, unless the counterparty, or the person offering to be the counterparty, of the person that is not an ECP falls under one of the enumerated exceptions not applicable here.

**B.      Prohibitions Against Fraud**

31.      The Act and Regulations contain numerous anti-fraud provisions applicable to various categories of entities or transactions.

32.      7 U.S.C. § 2(c)(2)(C)(ii)(I) states that Sections 4b and 4o of the Act apply to forex agreements, contracts, or transactions described in 7 U.S.C. § 2(c)(2)(C)(i) and accounts or pooled investment vehicles described in 7 U.S.C. § 2(c)(2)(C)(vii).  7 U.S.C. § 2(c)(2)(C)(iv) also expressly makes Section 4b of the Act applicable to retail forex transactions, including those solicited by Proposed Defendants, "as if" they were a contract of sale of a commodity for future delivery.  Finally, 7 U.S.C. § 2(c)(2)(C)(vii) provides, that the Commission has jurisdiction over an account or pooled investment vehicle that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency described in clause 2(c)(2)(C)(i).

33.      Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2018), makes it unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—to cheat, or defraud or attempt to cheat or defraud; willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; or willfully to deceive, or attempt to deceive, the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2),

with the other person.  Likewise, Regulation 5.2(b), 17 C.F.R § 5.2(b) (2019), makes it unlawful for any person by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction to cheat or defraud or attempt to cheat or defraud any person; willfully to make or cause to be made to any person any false report or statement or cause to be entered for any person any false record; or to willfully deceive, or attempt to deceive, any other person by any means whatsoever.

34.     Section 4*o*(1)(A) and (B) of the Act, 7 U.S.C. § 6*o*(1)(A) and (B) (2018), in relevant part, makes it unlawful for CPOs to make use of the mails or any other means of interstate commerce, directly or indirectly, to employ any device, scheme or artifice to defraud any client or participant or prospective client or participant, or to engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any client or participant or prospective client or participant.

**C.     Registration Requirements**

35.     With certain specified exceptions and exemptions not applicable here, Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018), prohibits anyone acting as a CPO from making use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO unless registered with the Commission in such capacity.  Likewise, Regulation 5.3(2)(i), 17 C.F.R. § 5.3(2)(i) (2019), requires any CPO who operates or solicits funds for a pooled investment vehicle that is not an ECP and that engages in retail forex transactions to register as a CPO.

36.     With certain specified exceptions and exemptions not applicable here, Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2018), provides that all APs of CPOs are required to be registered with the Commission.  Likewise, Regulation 5.3(a)(2)(ii), 17 C.F.R. § 5.3(a)(2)(ii) (2019) requires any AP of a CPO of a retail forex pool to register as an AP.

37.     Regulation 4.13(a)(2), 17 C.F.R. § 4.13(a)(2) (2019), provides in pertinent part that a person is not required to register under the Act as a CPO if (i) none of the pools operated by it has more than 15 participants at any time; and (ii) the total gross capital contributions it receives for units of participation in all of the pools it operates or that it intends to operate do not in the aggregate exceed $400,000.

## VI.     FACTS

### A.     Background

38.     Highrise serves as a "master fund" entity in a "master-feeder" fund structure. As the "master" fund, Highrise directly and indirectly through feeder funds solicited money from pool participants to trade forex.  At all times relevant hereto, Highrise pool participants deposited funds directly into Highrise or indirectly through one of four Feeder Pools (Bull Run, Green Knight, King Royalty, and SR&B), which deposited participant funds in Highrise.  Highrise pooled the funds together, and commingled the pool participant funds with other non-pool participant funds.  Highrise then transferred a portion of the pool participants' funds into forex trading accounts in Highrise's own name.

**B.      Defendants' Fraudulent Scheme**

**1.      The origin of Highrise's fraud: the Master Pool**

39.      Beginning on or around February 2013 and continuing to the present, Singh and Highrise solicited pool participants to invest in forex trading.   As a result of these solicitations, pool participants sent Highrise over $4,750,000.   Rather than trade all pool participant funds, Singh and Highrise misappropriated at least $3,000,000, which were used for Ponzi-type payments and personal expenses, in addition to payments to the Feeder Pools. In order to conceal their misappropriation, Highrise issued monthly account statements with false information and masked its misappropriation by making Ponzi-type payments.

40.      On information and belief, Highrise used the two web sites operated by Amaya, https://piptionaryclub.com and www.mql5.com/en/users/highrise to solicit funds from the public.

41.      Singh marketed himself as a successful trader.   As early as 2013, Singh claimed to be a professional trader with over 10 years of forex trading experience.   Singh told a prospective pool participant that he was a commodity trader, had several pools and investors, and falsely, that those investments were low risk and had a track record of positive gains with no loss.

42.      During the Relevant Period, Singh instructed pool participants to sign contracts with Highrise.   At least some contracts specified that the participants' funds would be "traded on FOREX only" and provided that the pool participant was required to pay to Highrise a fee of 50% of the individual pool participant's purported profit per positive trading month for reimbursement of Highrise's ordinary administrative expenses.

43.     Singh and Highrise instructed pool participants to write checks or wire funds directly to bank accounts in the name of Highrise, which Singh controlled, where pool participant funds were pooled and commingled, including with Singh's own funds. Singh used those accounts to pay for his own personal expenses.

44.     Credit card records for an account in Highrise's name reflect that for the time period between January 2017 and April 2020, over $50,000 was transferred from this account to Green Knight and over $314,000 to King Royalty.  And for the same time period, the same account was used to pay for Singh's personal expenses including pest control, house cleaning services, and medical costs.

45.     Commencing on or about December 13, 2016, Highrise opened nine forex trading accounts with a retail foreign exchange dealer ("RFED"), RFED 1 in New York, in the name of Highrise.  Singh transferred some of the pool participants' funds to RFED 1 and traded it there.

46.     Based on information and belief, Highrise also opened forex trading accounts at foreign RFEDs, including foreign RFEDs located in Australia, Estonia, and the Republic of Vanuatu, during the Relevant Period.

   **2.     Highrise's fraudulent scheme branched out with Green Knight, SR&B, King Royalty, and Bull Run**

      **i.  Green Knight**

47.     Commencing in or about September 2016, Cologero marketed Green Knight through word of mouth as a successful private investment club.  He instructed prospective pool participants to sign contracts with Green Knight and represented to them that their funds would be used to trade forex through a trader known to Cologero, but whose identity would

not be disclosed to the participant.  Cologero opened at least four bank accounts in Green Knight's name at three separate financial institutions.  Cologero is a signatory on these four bank accounts.

48.     By at least September 2016, Green Knight began to transfer funds from pool participants of the Green Knight pool to the Master Pool for the purpose of forex trading. Between January 2017 and September 2019, Green Knight received at least $570,000 in funds from at least 41 Green Knight pool participants and transferred at least that amount to Highrise.  Highrise transferred some funds back to Green Knight during the Relevant Period.

49.     Pool participants who deposited their money indirectly with Highrise, through Green Knight, deposited with Green Knight pursuant to a contract entitled "Terms and Conditions" which provided that pool participant funds are "traded on FOREX only."

50.     This contract provided that the pool participant was required to pay to Green Knight a "performance fee" of 25% of the individual pool participant's purported profit per positive trading month for Green Knight's management services and profit.

51.     For pool participants that deposited through Green Knight, Highrise took 50% of the pool participant's purported monthly profit.  The contract provided to pool participants did not disclose that Highrise took 50% of the purported profits before Green Knight took its 25% fee.  As a result of this incompletely disclosed fee structure, Green Knight pool participants were entitled to less than half of the pool participant's pro rata share in trading profits.

52.     On a monthly basis, Green Knight provided its pool participants an account statement showing their purported pro rata share of profits after fees.  This monthly statement

did not reflect the deduction of the 50% fee taken by Highrise and the 25% fee taken by Green Knight from the individual pool participant's profit.

53.     Commencing in at least February 2017, Green Knight also issued a newsletter to its pool participants that claimed Green Knight was making consistent profits.   For example, in:

    a.   "Volume I" of a 2017 electronic newsletter sent to pool participants, Green Knight claimed the following:

- "September 2016 through January 31st 2017, ALL Green Knight accounts have grown by over 26 percent!"

- "Monthly returns have been averaging between 3-5% of account balance".

- "This means if you started a $5,000 account in September, you would already have over $6300.00 in your account."

- "Keep in mind, the larger your account, the larger your return, and the quicker your account balance grows."

    b.   "Volume II" of the 2017 electronic newsletter sent to pool participants, Green Knight claimed that from "January 1st through June 30, 2017 ALL Green Knight accounts have grown by over 36%! This means if you invested $10,000 on January 1st, you would already have Over $13,600.00 in your account."

    c.   "Volume I" of the 2018 electronic newsletter sent to pool participants, Green Knight claimed that "2017 was a year of consistent and significant

growth. We're so pleased our customers made over an 86% return through the course of the year! Our average monthly return was over 5%."  The newsletter also provided the following breakdown of percentage growth in 2017:

| 2017 Monthly Percentages | |
|---|---|
| **Month** | **%** |
| January | 5.17 |
| February | 5.14 |
| March | 5.17 |
| April | 5.32 |
| May | 5.53 |
| June | 5.37 |
| July | 6.01 |
| August | 4.25 |
| September | 6.16 |
| October | 5.14 |
| November | 5.48 |
| December | 5.33 |
| **Average %** | 5.33 |
| **2017 Total ROI** | 86.74 |

### ii. SR&B

54.     Sahdeo opened at least eight bank accounts in SR&B's name at three separate financial institutions.  Sahdeo is the sole signatory on at least four of those bank accounts.

55.     By at least March 2015, SR&B began to transfer funds to Highrise.  Between at least March 2015 and August 2019, SR&B received at least $1,350,000 in funds from at least 77 SR&B pool participants, some of whom noted that their deposits were for investment into SR&B.  SR&B then transferred these participant deposits to Highrise, noting that the funds were being deposited to fund its forex account.  Highrise transferred some funds back to SR&B during the Relevant Period.

56.     SR&B also held at least four forex trading accounts at RFED 1 in its own name.  SR&B deposited at least $129,000 into these accounts.

### iii. King Royalty

57.     Raj opened at least nine bank accounts in King Royalty's name at seven separate financial institutions.  Raj is the sole signatory to these bank accounts.

58.     Commencing in or about January 2015, Raj marketed King Royalty through, at a minimum, word of mouth and held himself out as a successful individual leading a group of traders that traded forex.  In his website https://kingrajsingh.com/, Raj refers to himself as "The Passive Income Artiste."  Raj states that his "mission is to empower others to overcome and generate passive income to create financial freedom and experience life to the fullest."  Raj states that he was "living paycheck to paycheck just to make ends meet" and that he has "made it his life's mission to help others get out of the financial rat race by creating passive income vehicles that literally pay you while you sleep."

59.     In or around June 2015, Raj told a prospective pool participant that he has a group of traders at Highrise that trade forex for him, that this investment opportunity is better than others because the traders completely close out the trades at the end of each month, and that there have been three years of consistent profits.   Raj told the prospective pool participant that they could expect profit of about 30% per year from their investment in the King Royalty commodity pool.   The prospective pool participant decided to make an initial deposit (henceforth Pool Participant #1).

60.     Pool Participant #1 received monthly account statements from Raj via e-mail. Those statements have shown forex trading profits with no reported losses.

61.     Based on receiving account statements from King Royalty showing profits, Pool Participant #1 decided to make additional fund contributions to the King Royalty pool.

62.     Raj provided Pool Participant #1 wire instructions for providing contributions to the King Royalty Pool.   Raj changed the instructions a number of times, providing Pool Participant #1 with different bank accounts for King Royalty.

63.     By at least January 2015, King Royalty began to transfer funds to Highrise. Between January 2015 and February 2019, King Royalty received $1,300,000 in funds from at least 63 King Royalty pool participants and transferred at least the same amount to Highrise.   Highrise transferred some funds back to King Royalty during the Relevant Period.

### iv.  Bull Run

64.     Rosseau opened at least three bank accounts in Bull Run's name at three separate financial institutions and is the sole signatory to these bank accounts.

65.     Commencing in or about February 2019, Rosseau told prospective pool participants that he knew a trader that traded forex and that profit margin averages were 4-5% a month.  At least one prospective participant understood that Bull Run worked with a trader in Orlando, Florida who traded forex daily.  He told at least one prospective pool participant that this trader had made great gains trading forex, even when the market was down.  Rosseau also provided at least one prospective participant with names of individuals who he claimed invested and made profitable returns.

66.     Rosseau emailed pool participants that deposited directly with Bull Run monthly account statements showing profits from forex trading in their accounts.

67.     Pool participants who deposited funds indirectly with Highrise through Bull Run received monthly account statements from Bull Run via e-mail.  The monthly account statements the pool participants in the Bull Run pool have received have consistently shown profits.

68.     By at least February 2019, Bull Run began to transfer funds to Highrise. Between February 2019 and July 2019, Bull Run received at least $82,000 in funds from at least nine Bull Run pool participants and transferred at least $75,000 of it to Highrise. Highrise transferred some funds back to Bull Run during the Relevant Period.

**3.     Most if not all of Defendants' pool participants were not ECPs**

69.     Most, if not all, of Defendants' pool participants were not ECPs under U.S.C. §1a(18)(A)(xi) (2018).

      **4.**      **Defendant Highrise and Singh's Misappropriated Pool Participant Funds**

70.    During the period from January 2015 to March 2020, Highrise solicited and accepted more than $4,750,000 from individual pool participants and from the Feeder Pools. Highrise deposited only a portion of those funds, $657,000, in forex trading accounts it maintained in its own name at RFED1. Highrise withdrew $169,000 from the RFED1 forex trading accounts and deposited those funds in Highrise bank accounts. Highrise gained approximately $160,000 by trading forex through RFED1 and it had combined balances of approximately $650,000 in RFED1 as of May 2020.

71.    Highrise also deposited $999,000 in its forex trading accounts at foreign RFEDs. Of this amount, Highrise and/or Singh withdrew approximately $600,000 from the foreign RFED forex trading accounts and deposited those funds in Highrise and/or Singh bank accounts. Upon information and belief, approximately $400,000 was either lost trading through the foreign RFEDs or remains as balances in those accounts.

72.    Overall, of at least $4,750,000 received by Highrise from pool participants, Highrise used only a combined amount of $1,656,000 for forex trading.

73.    Highrise and Singh misappropriated at least $3,000,000 of the pool participants' funds to pay for, among other things, Singh's personal expenses and to make Ponzi-type payments to pool participants, in addition to payments to feeder fund entities. For example, over $1,500,000 was used to pay for transactions that are not directly related to forex trading including payments for travel, car costs, professional services, retail purchases, phone bills, marketing, home and personal costs, events, dining, and other miscellaneous expenses.

### 5.   False Statements

74.     Highrise sent pool participants monthly account statements via e-mail (the "Monthly Statements").  A Pool Participant in the Master Pool who deposited funds directly with Highrise, "Pool Participant #2", received Monthly Statements.  The Monthly Statements provided Pool Participant #2 with information including opening balance, profit, deposit, withdrawal, and account balance.  The Monthly Statements did not provide the Master Pool's account activity, profits, losses, net balances, or the participation units of the participant.

75.     The statements Pool Participant #2 received were false.  On at least eighteen occasions, they showed profits for a given month that were larger than the entire actual forex trading profits of the Master Pool or showed account balances that were larger than the forex account balances of the entire Master Pool.

76.     Highrise prepared Pool Participant #2's Monthly Statements knowing that they would be provided to Pool Participant #2, whom Highrise knew or should have known would rely upon the information included.

77.     Highrise intentionally issued Monthly Statements with false information to mislead and lull participants into continuing to deposit funds in the pool.

78.     Highrise also issued Monthly Statements to Green Knight and, on information and belief, to SR&B, King Royalty and Bull Run.  These Monthly Statements were also false.

79.     As the sole signatory on the Highrise bank accounts used to collect funds from pool participants and the Highrise accounts used for forex trading, Singh had personal knowledge of the amount of funds accepted from pool participants, the disposition of those

funds, the losses in Highrise's trading accounts and the profits made from trades undertaken on behalf of pool participants.  When Highrise issued Monthly Statements with false information, Singh knew that Highrise's representations were false.

## C.    Failure to Register

80.    During the Relevant Period, the Corporate Defendants acted as CPOs in that they solicited and accepted funds from pool participants for the purpose of pooling the funds in commodity pools.  The Feeder Pools pooled their pool participant funds and sent some or all of the pooled funds to Highrise to trade forex.  Highrise solicited and accepted funds directly from its own pool participants and from the Feeder Pools to trade forex.  Thus, the Corporate Defendants acted as CPOs, but were not registered as required.

81.    On September 2, 2014, Singh filed a notice of exemption with the National Futures Association (NFA) on behalf of Highrise claiming it was exempt from the requirement to register as a CPO pursuant to CFTC Regulation 4.13 (a)(2), 17 C.F.R. § 4.13(a)(2) (2019).  This self-executing exemption has remained in effect since that date. By filing for the exemption pursuant to CFTC Regulation 4.13(a)(2), Singh and Highrise affirmed that none of the pools operated by them has more than 15 participants at any time and that the total gross capital contributions the pool receives for units of participation in all of the pools it operates or that it intends to operate do not in the aggregate exceed $400,000. 17 C.F.R. § 4.13(a)(2) (2019).  Highrise collected more than $400,000 in gross capital contributions by at least September 20, 2016.  Because Highrise did not fit both of the requirements of CFTC Rule 4.13(a)(2), Highrise is not eligible for the exemption that it

claimed under 17 C.F.R. § 4.13(a)(2) (2019) and, therefore, should have been registered as a CPO no later than September 20, 2016.

82.    At no time during the Relevant Period did any of the Corporate Defendants register as CPOs with the Commission.

83.    Likewise, none of the Individual Defendants registered as APs of their respective CPOs during the Relevant Period.

**D.    Failure to Comply with Regulations Relating to Pool Organizations and Operation.**

84.    The Corporate Defendants, while acting as CPOs of their respective pools, failed to operate them as legal entities separate from those of the CPOs.  In addition, Defendants Highrise, Green Knight, Bull Run, and King Royalty failed to provide to prospective or current pool participants, pool disclosure documents, containing information required by Regulation 4.21, 17 C.F.R. § 4.21 (2019).

## VII.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

### FRAUD AND MISREPRESENTATION

**Violations of Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2018), and Regulation 5.2(b), 17 C.F.R. § 5.2(b) (2019)
(Against Singh and Highrise)**

85.    The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

86.    7 U.S.C. § 6b(a)(2)(A)-(C) makes it unlawful:

> [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery . . . that is made, or to be made, for or on behalf of, or

> with, any other person, other than on or subject to the rules of a
> designated contract market—(A) to cheat or defraud or attempt to
> cheat or defraud the other person; (B) willfully to make or cause
> to be made to the other person any false report or statement or
> willfully to enter or cause to be entered for the other person any
> false record; (C) willfully to deceive or attempt to deceive the
> other person by any means whatsoever in regard to any order or
> contract or the disposition or execution of any order or contract,
> or in regard to any act of agency performed, with respect to any
> order or contract for or, in the case of paragraph (2), with the
> other person[.]

7 U.S.C. § 6b(a)(2)(A)-(C) applies to Singh and Highrise's forex transactions, and

agreements or contracts offered by Singh and Highrise pursuant to Section 2(c)(2)(C)(ii)(I)

and 2(c)(2)(C)(iv) of the Act, 7 U.S.C. § 2(c)(2)(C)(ii)(I), 2(c)(2)(C)(iv) (2018).

87.     17 C.F.R. § 5.2(b) makes it unlawful for a person by use of the mails, or any

means or instrumentality of interstate commerce, directly or indirectly, in or in connection

with any retail forex transaction:  (1) to cheat or defraud or attempt to cheat or defraud any

person; (2) willfully to make or cause to be made to any person any false report or statement

or cause to be entered for any person any false record; or (3) willfully to deceive or attempt

to deceive any person by any means whatsoever.

88.     As set forth above, from at least February 2013, through the present, in or in

connection with forex contracts, made, or to be made, for or on behalf of other persons,

Highrise by and through Singh, cheated or defrauded, or attempted to cheat or defraud, pool

participants or prospective pool participants and willfully deceived or attempted to deceive

pool participants or prospective pool participants by, among other things, misrepresenting the

performance of the Master Pool, issuing Monthly Statements to individual pool participants

that deposited funds directly with Highrise and to at least one Feeder Pool that contained

false information about the profits and balances of the individual pool participant's respective interests in the Master Pool and the Feeder Pool's respective interests in the Master Pool, and misappropriating pool participant funds.

89.     Highrise by and through Singh, engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

90.     Highrise and Singh used or are using the mails, telephone services, or other instrumentalities of interstate commerce to engage in business in connection with retail forex transactions.

91.     Singh controlled Highrise, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Highrise's conduct alleged in this Count. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018), Singh is liable for Highrise's violations of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b).

92.     The foregoing acts, misrepresentations and omissions of Singh occurred within the scope of his employment, office or agency with Highrise.  Therefore, Highrise is liable for these acts pursuant to Section 2(a)(l)(B) of the Act, 7 U.S.C. § 2(a)(l)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2019).

93.     Each act of misrepresentation or omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6b(a)(2)(A)-(C) and 17 C.F.R. § 5.2(b).

## COUNT TWO

### FRAUD BY A COMMODITY POOL OPERATOR

**Violations of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2018)**
**(Against Highrise, Green Knight, Bull Run, and King Royalty)**

94.     The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

95.     Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2019), defines a CPO for purposes of 17 C.F.R. part 5 as "any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an ECP as defined in Section 1a(18) of the Act, 7 U.S.C. § 1a(18) (2018), and that engages in retail forex transactions."

96.     During the period from at least February 2013 to the present, Highrise has acted as CPO for the Master Pool.  During the period from at least September 2016 to the present, Green Knight has acted as CPO for the Green Knight Pool.  During the period from at least February 2019 to the present, Bull Run has acted as CPO for the Bull Run Pool. During the period from at least January 2015 to the present, King Royalty has acted as CPO for the King Royalty Pool.  During these time frames, Highrise, Green Knight, Bull Run, and King Royalty acted as CPOs because they solicited and accepted funds for a pooled investment vehicle from non-ECPs for the purpose of engaging in trading retail forex.

97.     7 U.S.C. § 6o(1)(A) and (B), in relevant part, makes it unlawful for CPOs, whether registered with the Commission or not, by use of the mails or any other means of interstate commerce, directly or indirectly, to: (A) employ any device, scheme or artifice to defraud any client or pool participant, or (B) engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any client or pool participant.  7 U.S.C.

§ 6*o*(1)(A) and (B) applies to the retail forex transactions, agreements or contracts, and accounts and pooled investment vehicles therein, offered by Highrise, Green Knight, Bull Run, and King Royalty, pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I) and 2(c)(2)(C)(vii).

98.     Highrise, while acting as a CPO, violated 7 U.S.C. § 6*o*(1)(A) and (B) by employing schemes or artifices to defraud pool participants and prospective pool participants and engaging in transactions, practices or a course of business which operated as a fraud or deceit upon pool participants or prospective pool participants by using the mails or other means or instrumentalities of interstate commerce.  The fraudulent acts include, but are not limited to, the following:  (1) falsely representing that all of the funds deposited with Highrise were being traded by Highrise, which was not true; (2) issuing Monthly Statements to individual pool participants that deposited funds directly with Highrise and to at least one Feeder Pool that contained false information about the profits and balances of the individual pool participant's respective interests in the Master Pool and the Feeder Pool's respective interests in the Master Pool; and (3) failing to disclose that pooled funds had been misappropriated by Singh for his own personal use.

99.     Green Knight, Bull Run, and King Royalty violated 7 U.S.C. § 6*o*(1)(B) in that they have engaged or are engaging in transactions, practices or a course of business which operated as a fraud or deceit upon commodity pool participants by (1) representing that all of the funds deposited with their respective Feeder Pools were being traded in forex, which was not true; and (2) issuing Monthly Statements to individual pool participants that deposited funds directly with their respective Feeder Pools that contained false information

about the profits and balances of each individual pool participant's interests in their respective Feeder Pool and Highrise.

100.    Highrise, Green Knight, Bull Run, and King Royalty used or are using the mails, telephone services, or other instrumentalities of interstate commerce to engage in business in connection with retail forex transactions.

101.    Each act of misappropriation, misrepresentation of material fact, and issuance of false statements, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6o(1)(A) and/or (B).

102.    Singh held and exercised direct and indirect control over Highrise and either did not act in good faith or knowingly induced Highrise's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b) for Highrise's violations of 7 U.S.C. § 6o(1)(A) and (B).

103.    Cologero held and exercised direct and indirect control over Green Knight and either did not act in good faith or knowingly induced Green Knight's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b) for Green Knight's violations of 7 U.S.C. § 6o(1)( B).

104.    Rosseau held and exercised direct and indirect control over Bull Run and either did not act in good faith or knowingly induced Bull Run's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b) for Bull Run's violations of 7 U.S.C. § 6o(1)(B).

105.    Raj held and exercised direct and indirect control over King Royalty and either did not act in good faith or knowingly induced King Royalty's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b) for King Royalty's violations of 7 U.S.C. § 6o(1)(B).

## COUNT THREE

### FRAUD BY ASSOCIATED PERSONS OF A COMMODITY POOL OPERATOR

**Violations of Section 4$o$(1) of the Act, 7 U.S.C. § 6$o$(1) (2018)
(Against Singh, Cologero, Rosseau, and Raj)**

106.    The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

107.    During the Relevant Period, Singh acted as an AP of a CPO for Highrise by soliciting individuals to become pool participants in regard to a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading commodity interests.

108.    As alleged above, during the Relevant Period, Singh while acting as an AP of Highrise, violated 7 U.S.C. § 6$o$(1)(A) and (B) by employing schemes or artifices to defraud pool participants and prospective pool participants and engaging in transactions, practices or a course of business which operated as a fraud or deceit upon pool participants or prospective pool participants by using the mails or other means or instrumentalities of interstate commerce.  The fraudulent acts include, but are not limited to, the following:  (1) falsely representing that all of the funds deposited with Highrise were being traded by Highrise, which was not true; (2) issuing Monthly Statements to individual pool participants that deposited funds directly with Highrise and to at least one Feeder Pool that contained false information about the profits and balances of the individual pool participant's respective interests in the Master Pool and the Feeder Pool's respective interests in the Master Pool; and (3) failing to disclose that pooled funds had been misappropriated by Singh for his own personal use.

109.    Singh was acting as an agent of Highrise when he violated the Act and, therefore, Highrise, as his principal, is liable for his acts, omissions and failures in violation of 7 U.S.C. § 6*o*(1)(A) and (B) pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

110.    Beginning at least in September 2016, Cologero acted as an AP of a CPO for the Green Knight Pool by soliciting individuals to become pool participants in regard to a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading commodity interests.

111.    As alleged above, beginning at least in September 2016, Cologero engaged in conduct that operated as a fraud or deceit upon prospective and existing pool participants in violation of 7 U.S.C. § 6*o*(1)(B) by:  (1) representing that all of the funds deposited with Green Knight were being traded in forex, which was not true; and (2) issuing Monthly Statements to individual pool participants that deposited funds directly with Green Knight with false information about the profits and balances of the individual pool participant's respective interests in Green Knight and Highrise.

112.    Cologero was acting as an agent of Green Knight when he violated the Act and, therefore, Green Knight, as his principal, is liable for his acts, omissions and failures in violation of 7 U.S.C. § 6*o*(1)(B) pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

113.    Beginning at least in February 2019, Rosseau acted as an AP of a CPO for the Bull Run Pool by soliciting individuals to become pool participants in regard to a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading commodity interests.

114. As alleged above, beginning at least in February 2019, Rosseau engaged in conduct that operated as a fraud or deceit upon prospective and existing pool participants in violation of 7 U.S.C. § 6*o*(1)(B) by: (1) representing that all of the funds deposited with Bull Run were being traded in forex, which was not true; and (2) issuing Monthly Statements to individual pool participants that deposited funds directly with Bull Run with false information about the profits and balances of the individual pool participant's respective interests in Bull Run and Highrise.

115. Rosseau was acting as an agent of Bull Run when he violated the Act and, therefore, Bull Run, as his principal, is liable for his acts, omissions and failures in violation of 7 U.S.C. § 6*o*(1)(B) pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

116. Beginning at least in January 2015, Raj acted as an AP of a CPO for the King Royalty Pool by soliciting individuals to become pool participants in regard to a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading commodity interests.

117. As alleged above, beginning at least in January 2015, Raj engaged in conduct that operated as a fraud or deceit upon prospective and existing pool participants in violation of 7 U.S.C. § 6*o*(1)(B) by: (1) representing that all of the funds deposited with King Royalty were being traded in forex, which was not true; and (2) issuing Monthly Statements to individual pool participants that deposited funds directly with King Royalty with false information about the profits and balances of the individual pool participants' respective interests in King Royalty and Highrise.

118.    Raj was acting as an agent of King Royalty when he violated the Act and, therefore, King Royalty, as his principal, is liable for his acts, omissions and failures in violation of 7 U.S.C. § 6*o*(1)(B) pursuant to, 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2.

119.    Singh, Cologero, Rosseau, and Raj used or are using the mails, telephone services, or other instrumentalities of interstate commerce to engage in business in connection with retail forex transactions.

120.    7 U.S.C. § 6*o*(1)(B) applies to the retail forex transactions, agreements or contracts, and accounts and pooled investment vehicles therein, offered by Singh, Cologero, Rosseau, and Raj pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I) and 2(c)(2)(C)(vii).

121.    Each misrepresentation or omission of material fact, issuance of a false statement or report, and misappropriation, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6*o*(1)(A),(B).

### COUNT FOUR

### FAILURE TO REGISTER AS A CPO

**Violations of Sections 2(c)(2)(C)(iii)(I)(cc) and 4m(1), 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) (2018) and Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2019)**

### (Against the Corporate Defendants)

122.    The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

123.    With certain specified exceptions and exemptions not applicable here, 7 U.S.C. § 6m(1) makes it unlawful for any CPO to make use of the mails or any means or instrumentality of interstate commerce in connection with its business unless it is registered

with the CFTC.  7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) also makes it unlawful for a CPO to operate a pooled investment in foreign currency whose participants are not ECPs without registration.

124.    Similarly, 17 C.F.R. § 5.3(a)(2)(i) makes it unlawful for any CPO, as defined in Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2019), to be engaged in retail forex transactions without being so registered.  17 C.F.R. § 5.1(d)(1) defines a CPO as "any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an eligible contract participant as defined in Section 1a(18) of the Act, 7 U.S.C. § 1a(18) (2018), and that engages in retail forex transactions."

125.    During the period from at least February 2013 to the present, Highrise acted as a CPO for Highrise within the meaning of Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2018), and 17 C.F.R. § 5.1(d)(1), and solicited and accepted funds, using instrumentalities of interstate commerce, for a pooled investment vehicle from non-ECPs for the purpose of engaging in retail forex transactions while failing to register as a CPO in violation of 7 U.S.C. § 6m(1).

126.    During the period from at least September 2016 to the present, Green Knight acted as CPO for the Green Knight Pool, within the meaning of 7 U.S.C. § 1a(11) and 17 C.F.R. § 5.1(d)(1), and solicited and accepted funds, using instrumentalities of interstate commerce, for a pooled investment vehicle from non-ECPs for the purpose of engaging in retail forex transactions while failing to register as a CPO in violation of 7 U.S.C. § 6m(1).

127.    During the period from at least March 2015 to the present, SR&B acted as CPO for the SR&B Pool, within the meaning of 7 U.S.C. § 1a(11) and 17 C.F.R. § 5.1(d)(1),

and solicited and accepted funds, using instrumentalities of interstate commerce, for a pooled investment vehicle from non-ECPs for the purpose of engaging in retail forex transactions while failing to register as a CPO in violation of 7 U.S.C. § 6m(1).

128.  During the period from at least February 2019 to the present, Bull Run acted as CPO for the Bull Run Pool, within the meaning of 7 U.S.C. § 1a(11) and 17 C.F.R. § 5.1(d)(1), and solicited and accepted funds, using instrumentalities of interstate commerce, for a pooled investment vehicle from non-ECPs for the purpose of engaging in retail forex transactions while failing to register as a CPO in violation of 7 U.S.C. § 6m(1).

129.  During the period from at least January 2015 to the present, King Royalty acted as CPO for the King Royalty pool, within the meaning of 7 U.S.C. § 1a(11) and 17 C.F.R. § 5.1(d)(1) and solicited and accepted funds, using instrumentalities of interstate commerce, for a pooled investment vehicle from non-ECPs for the purpose of engaging in retail forex transactions while failing to register as a CPO in violation of 7 U.S.C. § 6m(1).

130.  The Corporate Defendants violated 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i) by engaging in these activities without having registered as CPOs.

131.  Singh held and exercised direct and indirect control over Highrise and either did not act in good faith or knowingly induced Highrise's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for Highrise's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 6m(1) and 17 C.F.R. § 5.3(a)(2)(i) .

132.  Cologero held and exercised direct and indirect control over Green Knight and either did not act in good faith or knowingly induced Green Knight's violations and is

therefore liable, pursuant to 7 U.S.C. § 13c(b), for Green Knight's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc) and 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

133.    Sahdeo held and exercised direct and indirect control over SR&B and either did not act in good faith or knowingly induced SR&B's violations and is therefore liable, pursuant    to    7 U.S.C.    §    13c(b),    for    SR&B's    violations    of    7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

134.    Rosseau held and exercised direct and indirect control over Bull Run and either did not act in good faith or knowingly induced Bull Run's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for Bull Run's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

135.    Raj held and exercised direct and indirect control over King Royalty and either did not act in good faith or knowingly induced King Royalty's violations and is therefore liable, pursuant to 7 U.S.C. § 13c(b), for King Royalty's violations of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

136.    Each use by the Corporate Defendants of the mails or any means or instrumentality of interstate commerce in connection with their business as a CPO without proper registration, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i).

## COUNT FIVE

### FAILURE TO REGISTER AS APs OF A CPO AND ALLOWING UNREGISTERED APs TO REMAIN ASSOCIATED WITH A CPO

### Violations of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2018) and Regulations 3.12 and 5.3(a)(2)(ii), 17 C.F.R. §§ 3.12, 5.3(a)(2)(ii) (2019)

### (Against All Defendants)

137.     The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

138.     With certain exemptions and exclusions not applicable here, it is unlawful for a person to be associated with a CPO as a partner, officer, employee, consultant, or agent, or a person occupying a similar status or performing similar functions, in any capacity that involves the solicitation of funds, securities, or property for participation in a retail forex pool unless registered with the Commission as an AP of the CPO pursuant to 7 U.S.C. § 6k(2) and 17 C.F.R. §§ 3.12, 5.3(a)(2)(ii).

139.     7 U.S.C. § 6k(2) also makes it unlawful for a CPO to permit such a person to become or remain associated with the CPO in any such capacity if the CPO knew or should have known that the person was not registered as an AP.

140.     17 C.F.R. § 3.12 prohibits any person from being associated with a CPO as an AP unless that person shall have registered with the CFTC as an AP of that sponsoring CPO.

141.     Singh violated 7 U.S.C. § 6k(2) and 17 C.F.R. §§ 3.12 and 5.3(a)(2)(ii) in that he acted as an AP of Highrise without the benefit of registration as an AP of a CPO; Cologero violated 7 U.S.C. § 6k(2) and 17 C.F.R. §§ 3.12 and 5.3(a)(2)(ii) in that he acted as an AP of Green Knight without the benefit of registration as an AP of a CPO; Sahdeo

violated 7 U.S.C. § 6k(2) and 17 C.F.R. §§ 3.12 and 5.3(a)(2)(ii) in that he acted as an AP of SR&B without the benefit of registration as an AP of a CPO; Rosseau violated 7 U.S.C. § 6k(2) and 17 C.F.R. §§ 3.12, and 5.3(a)(2)(ii) in that he acted as an AP of Bull Run without the benefit of registration as an AP of a CPO; Raj violated 7 U.S.C. § 6k(2) and 17 C.F.R. §§ 3.12 and 5.3(a)(2)(ii) in that he acted as an AP of King Royalty without the benefit of registration as an AP of a CPO.

142.    Highrise violated 7 U.S.C. § 6k(2) in that, acting as a CPO, it allowed Singh to act as its AP when it knew or should have known that Singh was not registered as an AP; Green Knight violated 7 U.S.C. § 6k(2) in that, acting as a CPO, it allowed Cologero to act as its AP when it knew or should have known that Cologero was not registered as an AP; SR&B violated 7 U.S.C. § 6k(2) in that, acting as a CPO, it allowed Sahdeo to act as its AP when it knew or should have known that SR&B was not registered as an AP; Bull Run violated 7 U.S.C. § 6k(2) in that, acting as a CPO, it allowed Rosseau to act as its AP when it knew or should have known that Rosseau was not registered as an AP; King Royalty violated 7 U.S.C. § 6k(2) in that, acting as a CPO, it allowed Raj to act as its AP when it knew or should have known that Raj was not registered as an AP.

143.    Each act by Singh of soliciting funds, securities, or property for participation in a retail forex pool while being associated with Highrise as a partner, officer, employee, consultant, or agent without being registered as an AP of a CPO, and each act by Highrise of allowing Singh to be associated with it in such a capacity when Highrise knew or should have known Singh was not registered as an AP, is alleged as a separate and distinct violation of 7 U.S.C. § 6k(2) and 17 C.F.R. §§ 3.12, and 5.3(a)(2)(ii).

144.   Each act by Cologero of soliciting funds, securities, or property for participation in a retail forex pool while being associated with Green Knight as a partner, officer, employee, consultant, or agent without being registered as an AP of a CPO, and each act by Green Knight of allowing Cologero to be associated with it in such a capacity when Green Knight knew or should have known Cologero was not registered as an AP, is alleged as a separate and distinct violation of 7 U.S.C. § 6k(2) and 17 C.F.R. §§ 3.12 and 5.3(a)(2)(ii).

145.   Each act by Sahdeo of soliciting funds, securities, or property for participation in a retail forex pool while being associated with SR&B as a partner, officer, employee, consultant, or agent without being registered as an AP of a CPO, and each act by SR&B of allowing Sahdeo to be associated with it in such a capacity when SR&B knew or should have known Sahdeo was not registered as an AP, is alleged as a separate and distinct violation of 7 U.S.C. § 6k(2) and 17 C.F.R. §§ 3.12, and 5.3(a)(2)(ii).

146.   Each act by Rosseau of soliciting funds, securities, or property for participation in a retail forex pool while being associated with Bull Run as a partner, officer, employee, consultant, or agent without being registered as an AP of a CPO, and each act by Bull Run of allowing Rosseau to be associated with it in such a capacity when Bull Run knew or should have known Rosseau was not registered as an AP, is alleged as a separate and distinct violation of 7 U.S.C. § 6k(2) and 17 C.F.R. §§ 3.12 and 5.3(a)(2)(ii).

147.   Each act by Raj of soliciting funds, securities, or property for participation in a retail forex pool while being associated with King Royalty as a partner, officer, employee, consultant, or agent without being registered as an AP of a CPO, and each act by King

Royalty of allowing Raj to be associated with it in such a capacity when King Royalty knew or should have known Raj was not registered as an AP, is alleged as a separate and distinct violation of 7 U.S.C. § 6k(2)  and 17 C.F.R. §§ 3.12 and 5.3(a)(2)(ii).

**COUNT SIX**

**FAILURE TO OPERATE COMMODITY POOL
AS A SEPARATE LEGAL ENTITY**

**Violations of Regulation 4.20(a)(1), (b), 17 C.F.R. § 4.20(a)(1), (b) (2019)
(Against All Defendants)**

148.    The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

149.    Regulation 5.4, 17 C.F.R. § 5.4 (2019), states that Part 4 of the CFTC's Regulations, 17 C.F.R. Part 4 (2019), applies to any person required to register as a CPO pursuant to Part 5 of the CFTC's Regulations relating to forex transactions, 17 C.F.R. Part 5 (2019).

150.    17 C.F.R. § 4.20(a)(l) requires a CPO to operate its commodity pool as an entity cognizable as a legal entity separate from that of the pool operator, with certain specified exceptions not applicable here.

151.    17 C.F.R. § 4.20(b) requires that all funds, securities, or other property received by a CPO from a prospective or existing pool participant must be received in the commodity pool's name.

152.    By accepting or depositing pool funds in bank and trading accounts held in the name of the Master Pool and Feeder Pools, and not into separate legal entities, the Corporate

Defendants failed to operate their pools as legal entities separate from themselves as pool operators, in violation of 17 C.F.R. § 4.20(a)(l) and (b).

153.    From at least:  a) February 2013 for Highrise; b) September 2016 for Green Knight; c) March 2015 for SR&B; d) February 2019 for Bull Run; and e) January 2015 for King Royalty, respectively, through the present, the Corporate Defendants, while acting as CPOs, violated 17 C.F.R. § 4.20(a)(l) and (b) by failing to operate their respective retail forex pools as legal entities separate from themselves.

154.    Defendant Singh controls Highrise, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Highrise's, conduct alleged in this Count.  Therefore, pursuant to 7 U.S.C. § 13c(b), Singh is liable for Highrise's violations of 17 C.F.R. § 4.20(a)(l) and, (b).

155.    Defendant Cologero controls Green Knight, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Green Knight's, conduct alleged in this Count.  Therefore, pursuant to 7 U.S.C. § 13c(b), Cologero is liable for Green Knight's violations of 17 C.F.R. § 4.20(a)(l) and, (b).

156.    Defendant Rosseau controls Bull Run, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Bull Run's, conduct alleged in this Count.  Therefore, pursuant to7 U.S.C. § 13c(b), Rosseau is liable for Bull Run's violations of 17 C.F.R. § 4.2(a)(l) and, (b).

157.    Defendant Raj controls King Royalty, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, King Royalty's, conduct alleged in

this Count.  Therefore, pursuant to 7 U.S.C. § 13c(b), Raj is liable for King Royalty's violations of 17 C.F.R. § 4.20(a)(l) and, (b).

158.    Defendant Sahdeo controls SR&B, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, SR&B's, conduct alleged in this Count.  Therefore, pursuant to 7 U.S.C. § 13c(b), Sahdeo is liable for SR&B's  violations of 17 C.F.R. § 4.20(a)(l) and, (b).

159.    Each instance of accepting funds in the name of the Corporate Defendants and not into separate legal entities, during the periods relevant to each CPO, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.20(a)(1) and (b).

**COUNT SEVEN**

**FAILURE TO PROVIDE POOL DISCLOSURES**

**Violations of Regulation 4.21, 17 C.F.R. § 4.21 (2019)**
**(Against Highrise, Singh, Green Knight, Cologero, Bull Run, Rosseau, King Royalty, and Raj)**

160.    The allegations set forth in the paragraphs above are re-alleged and incorporated herein by reference.

161.    17 C.F.R. § 4.21(a)(1) provides that "each commodity pool operator registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with §§ 4.24 and 4.25 by no later than the time it delivers to the prospective participant a subscription agreement for the pool . . . ."

162.    Defendants Highrise, Green Knight, Bull Run, and King Royalty failed to provide prospective pool participants with pool disclosure documents in the form specified in Regulations 4.24 and 4.25, 17 C.F.R. §§ 4.24, 4.25 (2019).

163.    Defendant Singh controls Highrise, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Highrise's, conduct alleged in this Count.  Therefore, pursuant to 7 U.S.C. § 13c(b), Singh is liable for Highrise's violations of 17 C.F.R. § 4.21.

164.    Defendant Cologero controls Green Knight, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Green Knight's, conduct alleged in this Count.  Therefore, pursuant to 7 U.S.C. § 13c(b), Cologero is liable for Green Knight's violations of 17 C.F.R. § 4.21.

165.    Defendant Rosseau controls Bull Run, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, Bull Run's, conduct alleged in this Count.  Therefore, pursuant to7 U.S.C. § 13c(b), Rosseau is liable for Bull Run's violations of 17 C.F.R. § 4.21.

166.    Defendant Raj controls King Royalty, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, King Royalty's, conduct alleged in this Count.  Therefore, pursuant to 7 U.S.C. § 13c(b), Raj is liable for King Royalty's violations of 17 C.F.R. § 4.21.

167.    By reason of the foregoing, Highrise, Green Knight, Bull Run, and King Royalty violated 17 C.F.R. § 4.21.

168.    Each failure to furnish the required disclosure documents to prospective pool participants and pool participants, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of 17 C.F.R. § 4.21.

## VIII.   RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2018), and pursuant to its own equitable powers:

A.    Find that Defendants Highrise and Singh violated Sections 4b(a)(2)(A)-(C) and 4*o*(1)(A) and (B) of the Act, 7 U.S.C. §§ 6b(a)(2)(A)-(C), 6*o*(1)(A), (B) (2018), and Regulation 5.2(b), 17 C.F.R § 5.2(b) (2019); Defendants Green Knight; Cologero, Bull Run, Rosseau, King Royalty and Raj violated 7 U.S.C. § 6*o*(1)(B) (2018); Defendants Highrise, Green Knight, SR&B, Bull Run and King Royalty violated Sections §§2(c)(2)(C)(iii)(I)(cc), and 4m(1) of the Act, 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) (2018), and Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2019); Defendants Highrise, Singh, Green Knight, Cologero, Bull Run, Rosseau, King Royalty, Raj, Sahdeo, and SR&B violated Section 4(k)(2) of the Act, 7 U.S.C. § 6k(2) (2018); Defendants Singh, Cologero, Rosseau, Raj, and Sahdeo violated Regulations 3.12 and 5.3(a)(2)(ii), 17 C.F.R. §§ 3.12, 5.3(a)(2)(ii) (2019); Defendants Highrise, Singh, Green Knight, Cologero, SR&B, Sahdeo, King Royalty, Raj, Bull Run and Rosseau violated Regulation 4.20(a)(l) and (b), 17 C.F.R. § 4.20(a)(1), (b) (2019), and Defendants Highrise, Singh, Green Knight, Cologero, King Royalty, Raj, Bull Run and Rosseau violated Regulation 4.21, 17 C.F.R. § 4.21 (2019);

B.    Enter an order of permanent injunction restraining and enjoining Defendants, their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in

active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(2)(A)-(C) and 6*o*(1)(A) and (B), and 17 C.F.R § 5.2(b) as to Defendants Highrise and Singh; 7 U.S.C. § 6*o*(1)(B) as to Defendants Green Knight, Cologero, Bull Run, Rosseau, King Royalty and Raj; 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i) as to Defendants Highrise, Green Knight, SR&B, Bull Run and King Royalty; 7 U.S.C. § 6k(2) as to Defendants Highrise, Singh, Green Knight, Cologero, Bull Run, Rosseau, King Royalty, Raj, Sahdeo, and SR&B; 17 C.F.R. §§ 3.12 and 5.3(a)(2)(ii) as to Defendants Singh, Cologero, Rosseau, Raj, and Sahdeo; 17 C.F.R. § 4.20(a)(l) and (b), as to Defendants Highrise, Singh, Green Knight, Cologero, Bull Run, Rosseau, King Royalty, Raj, SR&B and Sahdeo, and 17 C.F.R. § 4.21 as to Defendants Highrise, Singh, Green Knight, Cologero, King Royalty, Raj, Bull Run and Rosseau.

C.     Enter an order of permanent injunction restraining and enjoining all Defendants and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

i.     Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § la(40) (2018));

ii.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2019), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

iii.   Having any commodity interests traded on any Defendant's behalf;

iv.   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

v.   Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

vi.   Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2019); and

vii.   Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2019)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

D.   Enter an order directing Highrise, Singh, Green Knight, Cologero, SR&B, Sahdeo, Bull Run, Rosseau, King Royalty¸ and Raj as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E.      Enter an order directing Highrise, Singh, Green Knight, Cologero, SR&B, Sahdeo, Bull Run, Rosseau, King Royalty¸ and Raj as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

F.      Enter an order directing Highrise, Singh, Green Knight, Cologero, SR&B, Sahdeo, Bull Run, Rosseau, King Royalty¸ and Raj as well as any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with or among Highrise, Singh, Green Knight, Cologero, SR&B, Sahdeo, Bull Run, Rosseau, King Royalty¸ and Raj and any of the pool participants whose funds were received by Highrise, Singh, Green Knight, Cologero, SR&B, Sahdeo, Bull Run, Rosseau, King Royalty¸ and Raj as a result of the acts and practices that constituted violations of the Act and Regulations as described herein;

G.      Enter an order directing Highrise, Singh, Green Knight, Cologero, SR&B, Sahdeo, Bull Run, Rosseau, King Royalty¸ and Raj to pay a civil monetary penalty assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6(c)(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1) (2018), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2019), for each violation of the Act and Regulations, as described herein;

H.      Enter an order requiring Highrise, Singh, Green Knight, Cologero, SR&B, Sahdeo, Bull Run, Rosseau, King Royalty¸ and Raj to pay costs and fees as permitted by 28 U.S.C §§ 1920, 2413(a)(2) (2018); and

47

I.      Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.

Dated: September 9, 2020                    Respectfully Submitted,


**COMMODITY FUTURES
TRADING COMMISSION**

By: /s/ Cristina Covarrubias

Cristina Covarrubias (Trial Counsel) (appearing
pursuant to Local Rule 2.02(b))
Susan B. Padove (appearing
pursuant to Local Rule 2.02(b))
Elizabeth M. Streit (appearing
pursuant to Local Rule 2.02(b))
Scott R. Williamson (appearing
pursuant to Local Rule 2.02(b))


Attorneys for Plaintiff
Commodity Futures Trading
Commission
525 W. Monroe St
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
*ccovarrubias@cftc.gov*
*spadove@cftc.gov*
*estreit@cftc.gov*
*swilliamson@cftc.gov*