UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

COMMODITY FUTURES TRADING
COMMISSION,

              Plaintiff,              Case No.: 6:20-cv-01657

              v.

HIGHRISE ADVANTAGE, LLC, BULL      Hon._____
RUN ADVANTAGE, LLC, GREEN
KNIGHT INVESTMENTS, LLC, KING
ROYALTY LLC, SR&B INVESTMENT
ENTERPRISES, INC., AVINASH SINGH,
RANDY ROSSEAU, DANIEL
COLOGERO, HEMRAJ SINGH, and
SURUJPAUL SAHDEO,
              Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY
MOTION FOR A STATUTORY RESTRAINING ORDER WITH NOTICE[1] AND
FOR A PRELIMINARY INJUNCTION**

---

[1] Because the Commission has been in contact with counsel for Defendants Green Knight and Cologero, the Commission intends to attempt to notify all Defendants after this case is filed and assigned to a judge that it is moving for a statutory restraining order.

i

## <u>Table of Contents</u>

I.   INTRODUCTION ............................................................................................. 1

II.  THE PARTIES ................................................................................................. 3

III. JURISDICTION AND VENUE .................................................................... 6

IV. FACTS .............................................................................................................. 7

   A.   Overview of the Defendants' Forex Trading Scheme ................................. 7

   B.   Defendant Highrise and Singh's Fraudulent Misrepresentations and False Statements
       Issued by Defendants Green Knight, King Royalty, and Bull Run ............................. 8

      1.   Highrise ............................................................................................. 8

      2.   Green Knight ..................................................................................... 9

      3.   King Royalty .................................................................................... 10

      4.   Bull Run ........................................................................................... 12

   C.   Defendant Highrise and Singh Misappropriated Pool Participant Funds ................. 13

   D.   SR&B is responsible for over 50% of the customers impacted in the scheme ........... 15

   E.   Defendants Committed Registration and Regulatory Violations ................................ 15

      1.   Defendants Failed to Register with the Commission ............................................. 15

      2.   Defendants Failed to Receive Funds in the Name of Separate Legal Entities ........ 16

      3.   Defendants Failed to Provide Risk Disclosures .................................................... 16

V.  THE ARGUMENT ....................................................................................... 17

   A.   Defendants Violated the Act and Commission Regulations ....................................... 17

      1.   Defendants Singh and Highrise Committed Fraud in Violation of Section
          4b(a)(2)(A)-(C) of the Act and Commission Regulation 5.2(b) by
          Misappropriation, Fraudulent Solicitation and False Statements (Count 1) ........... 17

         a.   Defendants Singh and Highrise Committed Fraud by Misappropriation ......... 18

b.     Defendants Singh and Highrise Made Fraudulent Misrepresentations............. 19

i.   Misrepresentations ............................................................ 20

ii.    Defendants Singh and Highrise's Misrepresentations Were Material .......... 21

iii.    Defendants Singh and Highrise Acted With Scienter .................................. 22

2.   Defendants Highrise Green Knight, Bull Run, King Royalty, Singh, Cologero, Rosseau and Raj Violated Section 4*o*(1)(A) and/or (B) of the Act (Counts 2 and 3) ............................................................................... 23

3.   Defendants Violated Section 4m(1) of the Act and Regulation 5.3(a)(2)(i) (Count 4) ........................................................................... 26

4.   Defendants Singh, Cologero, Sahdeo, Rosseau and Raj Violated Section 4k(2) of the Act and Regulations 3.12, 5.3(a)(2)(ii) by Acting As APs of a CPO, Without Registering as Such and Highrise, Green Knight, SR&B, Bull Run, and King Royalty Violated those Sections and Regulations by Permitting their Respective APs to Act in an Unregistered Capacity (Count 5)................................. 27

5.   Defendants Violated Regulation 4.20(a)(1),(b) By Failing to Operate their Respective CPOs as Separate Legal Entities (Count 6)......................................... 28

6.   Defendants Highrise, Green Knight, Bull Run and King Royalty Failed to Provide Pool Participants with Required Pool Disclosures in Violation of Regulation 4.21 (Count 7) ........................................................................ 29

7.   Principal-Agent and Controlling Person Liability .................................... 30

a.    Principal-Agent ..................................................... 30

b.    Controlling Person Liability .......................................... 31

B.   The Commission Has Made a Compelling Case for a Statutory Restraining Order .. 33

C.   Preliminary Injunctive Relief is Necessary and Appropriate ...................... 40

VI.  CONCLUSION .................................................................. 41

## **Table of Authorities**

**Cases**

*Apache Trading Corp.*, CFTC No. 87-14, 1992 WL 52596 (Mar. 11, 1992)...................... 32

*CFTC v. Allied Markets LLC*, 371 F. Supp. 3d 1035 (M.D. Fla. 2019) ....................... 18, 34

*CFTC v. Am. Bd. of Trade, Inc.*, 803 F.2d 1242 (2d Cir. 1986) ......................................... 41

*CFTC v. Am. Bullion Exch. ABEX, Corp. ("Am. Bullion")*, No. SACV 10-1876-DOC
(RNBx), 2014 WL 12603558 (C.D. Cal. Sept. 16, 2014)............................................ 28, 30

*CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) ............................................................. 18

*CFTC v. British American Commodity Options Corp,* 560 F.2d 135 (2d Cir.1977).......... 41

*CFTC v. Brown*, No. 3:15-CV-354-BJD-MCR, 2015 WL 10963747
(M.D. Fla. Apr. 8, 2015) ................................................................................................. 38

*CFTC v. Capital Blu Mgmt., LLC*, No. 6:09-CV-508-ORL-28, 2011 WL 2357629 (M.D.
Fla. June 9, 2011)............................................................................................................ 40

*CFTC v. Driver*, 877 F. Supp. 2d 968 (C.D. Cal. 2012), *aff'd*, 585 F. App'x 366 (9th Cir.
2014) ................................................................................................................................ 22

*CFTC v. E-Metal Merchants, Inc.*, No. 1:05CV21571, 2005 WL 3741509
(S.D. Fla. June 13, 2005) ................................................................................................ 37

*CFTC v. Fin. Tree,* No. 2:20-CV-01184-TLN-AC, 2020 WL 3893390
(E.D. Cal. July 2, 2020) .................................................................................................. 39

*CFTC v. Fleury*, No. CIV.A. 03-61199, 2010 WL 5146283(S.D. Fla. June 18, 2010)...... 21

*CFTC v. Gibraltar Monetary Corp., Inc.*, No. 04-80132-CIV, 2004 WL 7334348
(S.D. Fla. Apr. 2, 2004) ............................................................................................. 35, 37

*CFTC v. Gibraltar*, 575 F. 3d 1180 (11th Cir. 2009) ....................................................... 31

*CFTC v. Hunter Wise Commodities*, LLC, 749 F.3d 967 (11th Cir. 2014)............. 21, 36, 40

*CFTC v. Khara*, No. 15 cv 03497, 2015 WL 10849125 (S.D.N.Y. May 5, 2016)............. 39

*CFTC v. Levy*, 541 F.3d 1102 (11th Cir. 2008) ................................................................. 36

*CFTC v. Machado*, No. 11-22275-CIV, 2012 WL 2994396 (S.D. Fla. Apr. 20, 2012)..... 19

*CFTC v. Matrix Trading Grp., Inc.*, No. 00-8880-CIV, 2002 WL 31936799
(S.D. Fla. Oct. 3, 2002) ................................................................................................... 21

*CFTC v. Maverick International, Inc., et al.*No. 3:15-cv-354-J-38MCR
(M.D. Fla. Mar. 26, 2015) ................................................ 34

*CFTC v. McLaurin*, No. 95-C-285, 1996 WL 385334 (N.D. Ill. July 3, 1996) ................. 20

*CFTC v. Mintline, Inc*., No. 14-61125-CIV, 2014 WL 4050014
(S.D. Fla. May 14, 2014) ................................................ 35

*CFTC v. Morgan, Harris & Scott, Ltd.,* 484 F. Supp. 669 (S.D.N.Y. 1979) ...................... 37

*CFTC v. Noble Wealth Data Info. Servs., Inc.*, 90 F. Supp. 2d 676
(D. Md. 2000) ................................................ 18, 20, 21

*CFTC v. Oasis Int'l Group, Ltd. et. al*, No. 8:19-cv-00886-VMC-SPF, ECF Dkt. No. 7
(M.D. Fla. April 15, 2019) ................................................ 39

*CFTC v. R.J. Fitzgerald & Co., Inc.,* 310 F. 3d 1321 (11th Cir. 2002) ...................... passim

*CFTC v. RFF GF, LLC*, No. 4:13–cv–382, 2013 WL 4083748 (E.D. Tex. Jul. 9, 2013) .. 39

*CFTC v. Rolando,* 589 F. Supp. 2d 159 (D. Conn. 2008) .................................... 20

*CFTC v. Rosenberg*, 85 F. Supp. 2d 424 (D.N.J. 2000) ......................................... 20, 21, 23

*CFTC v. Vartuli,* 228 F.3d 94 (2d Cir. 2000) .................................................... 24

*CFTC v. Vishnevetsky*, No. 1:12–cv–03234, 2012 WL 2930302 (N.D. Ill. May 1, 2012 .. 39

*CFTC v. Weinberg*, 287 F. Supp. 2d 1100 (C.D. Cal. 2003) ................................. 24

*CFTC v. Wilshire Inv. Mgmt. Corp*., 531 F.3d 1339 (11th Cir. 2008.) ............................. 36

*Drexel Burnham Lambert, Inc. v. CFTC*, 850 F. 2d 742, (D.C. Cir. 1988) ...................... 22

*Hammond v. Smith Barney Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm.
Fut. L. Rep. (CCH) ¶ 24,617 (CFTC Mar. 1, 1990) ........................................... 19

*Harrison v. Dean Witter Reynolds, Inc*., 974 F.2d 873 (7th Cir.1992) .............................. 31

*In re Commodities Int'l Corp.,* CFTC No. 83-43, 1997 WL 11543 (Jan. 14, 1997) .......... 21

*In re Kolter*, CFTC No. 93-19, 1994 WL 621595 (Nov. 8, 1994) ..................................... 25

*In re R&W Technical Servs.*, CFTC No. 96-3, 1999 WL 152619 (March 16, 1999) ......... 25

*In re Slusser*, CFTC No. 94-14, 1999 WL 507574 (July 19, 1999) .................................. 19

*In re Spiegel*, No. CFTC No. 85-19, 1988 WL 232212 (Jan. 12, 1988) ............................ 32

*JCC, Inc. v. CFTC*, 63 F.3d 1557 (11th Cir. 1995) ..................................................... 31, 32

*Kelley v. Skorupskas*, 605 F. Supp. 923 (E.D. Mich. 1985) .................................. 20, 21, 24

*Lawrence v. CFTC,* 759 F. 2d 767 (9th Cir. 1985) ............................................................. 22

*Luis v. United States*, 136 S. Ct. 1083 (2016) ................................................................. 38

*McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316 (1819) ................................................ 39

*Messer v. E.F. Hutton & Co.*, 847 F.2d 673 (11th Cir. 1988) ........................................ 25

*Monieson v. CFTC*, 996 F.2d 852 (7th Cir.1993) ................................................. 31, 32, 33

*R&W Technical Serv. Ltd. v. CFTC*, 205 F. 3d 165 (5th Cir. 2000) ................................. 21

*Wasnick v. Refco., Inc.,* 911 F. 2d 345 (9th Cir. 1990) .................................................... 22

## Statutes

28 U.S.C. § 1331 (2018) ............................................................................................... 6, 26

28 U.S.C. § 1345 (2018) .................................................................................................... 6

7 U.S.C. §  13a-1(e) (2018) ......................................................................................... 7, 36

7 U.S.C. §  13c(b) ...................................................................................................... 29, 31

7 U.S.C. § 1a(11) (2018) ................................................................................................. 24

7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) (2018) ....................................................................... 2, 27

7 U.S.C. § 6b(a)(2)(A)-(C) (2018) .............................................................................. 2, 17

7 U.S.C. § 6k(2) (2018) ......................................................................................... 2, 27, 28

7 U.S.C. § 6m(1) (2018) ............................................................................................. 2, 26

7 U.S.C. § la(l8)(xi) (2018) ............................................................................................ 17

7 U.S.C. §§ 1 *et seq*. (2018) ............................................................................................. 1

7 U.S.C. §§ 1-26 (2018) .................................................................................................... 4

7 U.S.C. §§ 6*o*(1) (B) ....................................................................................................... 2

7 U.S.C. §§ 6*o*(1)(A) ....................................................................................................... 2

7 U.S.C. §13a-1(a)(2018) ........................................................................................ passim

7 U.S.C. 2(a)(1)(B) (2018) ............................................................................................. 30

## Other Authorities

H.R. Rep. No. 97-565, at 53-54, 93 (1982) ............................................................... 34, 39

## Regulations

17 C.F.R § 5.2(b) ............................................................................................................. 2

17 C.F.R. §  4.20(a)(l) ..................................................................................................... 29

17 C.F.R. § 1.2 (2019) ................................................................................ 30

17 C.F.R. § 1.3 (2019) ................................................................................ 24

17 C.F.R. § 3.12 (2019) ........................................................................... 2, 27

17 C.F.R. § 4.13(a)(2) (2019) ...................................................................... 4

17 C.F.R. § 4.15 (2019) .............................................................................. 24

17 C.F.R. § 4.20(a)(1) (2019) .................................................................. 3, 28

17 C.F.R. § 4.21 ........................................................................................... 3

17 C.F.R. § 4.21(a)(1) (2019) ..................................................................... 29

17 C.F.R. § 4.24 (2019) .............................................................................. 30

17 C.F.R. § 4.25 (2019) .............................................................................. 30

17 C.F.R. § 5.1(d)(1) (2019) ....................................................................... 24

17 C.F.R. § 5.2(b)(1)-(3) (2019) ................................................................. 18

17 C.F.R. § 5.3(a)(2)(i) ................................................................................ 2

17 C.F.R. § 5.3(a)(2)(ii) (2019) ............................................................ 2, 3, 27

17 C.F.R. § 5.4 (2019) ................................................................................ 28

17 C.F.R. §§ 1 *et seq.* (2019). ..................................................................... 1

17 C.F.R. §§ 4.20(b) (2019)................................................................. 3, 28, 29

17 C.F.R. pt. 4 (2019) ................................................................................ 28

17 C.F.R. pt. 5 (2019) ................................................................................ 28

# I.     INTRODUCTION

The Commission seeks emergency injunctive relief, pursuant to Section 6c(a) of the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §13a-1(a)(2018), and in accordance with Rule 65 of the Federal Rules of Civil Procedure, against Avinash Singh ("Singh") and his company Highrise Advantage, LLC ("Highrise"), Randy Rosseau ("Rosseau") and his company Bull Run Advantage, LLC ("Bull Run"), Daniel Cologero ("Cologero") and his company Green Knight Investments, LLC ("Green Knight"), Hemraj Singh ("Raj") and his company King Royalty LLC, ("King Royalty") and Surujpaul Sahdeo ("Sahdeo") and his company SR&B Investment Enterprises, Inc. ("SR&B"), (collectively, "Defendants"), for violating the Act, 7 U.S.C. §§ 1 *et seq.* (2018), and Commission Regulations ("Regulations"), 17 C.F.R. §§ 1 *et seq.* (2019).

In its contemporaneously filed Complaint[2], and as described below, the Commission alleges, among other things, that Defendants have solicited and accepted at least $4,750,000 from at least 150 customers ("pool participants"), in connection with pooled investments in retail foreign currency contracts ("forex").  Pool participants deposited funds directly into the Highrise master commodity pool ("Master Pool") or into one of four "feeder" pools (Bull Run, Green Knight, King Royalty, and SR&B) (collectively, "Feeder Pools") that funneled deposits they received to the Master Pool.  Rather than use all of pool participants' funds to

---

[2] Plaintiff has also filed today its: (1) Complaint for Injunctive Relief, Civil Monetary Penalties, and other Equitable Relief; (2) Emergency Motion for a Statutory Restraining Order with Notice and a Proposed Order; (3) Motion for a Preliminary Injunction and a Proposed Order; (4) Motion for Expedited Discovery and Proposed Order and (5) Motion for Extension of Pages and Proposed Order.

trade forex in the Master Pool, Singh and Highrise traded only a small portion and instead misappropriated over $3 million of pool participants' funds to pay for personal expenses and to make Ponzi-type payments to other pool participants, in addition to payments to feeder fund entities.  Highrise, Green Knight, King Royalty, SR&B and Bull Run ("the "Corporate Defendants") also illegally operated as commodity pool operators ("CPOs") without registration and while not establishing their commodity pools as separate legal entities.

As part of the fraudulent scheme, Highrise issued monthly account statements to pool participants that directly participated with Highrise as well as to at least one Feeder Pool, which misrepresented the profits and balances of the pool participants' respective interests in the Master Pool.  Green Knight, Bull Run, and King Royalty likewise each issued monthly account statements to their pool participants that misrepresented the profits and balances of the pool participants' respective interests in the Feeder Pools, as well as the Master Pool. SR&B funneled at least $1,350,000 to Highrise for forex trading while operating in an illegal manner by not registering as a CPO and not operating its commodity pool as a legal entity separate from the pool operator.

Based on this conduct and the conduct further described below, Defendants have engaged, are engaging in, or are about to engage in acts or practices constituting violations of provisions of the Act and Regulations.[3]

_____

[3] In particular, Plaintiff's Complaint alleges violations of 7 U.S.C. §§ 6b(a)(2)(A)-(C) and 6*o*(1)(A) and (B), and 17 C.F.R § 5.2(b) as to Defendants Highrise and Singh; 7 U.S.C. § 6*o*(1)(B) as to Defendants Green Knight, Cologero, Bull Run, Rosseau, King Royalty and Raj; 7 U.S.C. §§ 2(c)(2)(C)(iii)(I)(cc), 6m(1) and 17 C.F.R. § 5.3(a)(2)(i) as to Defendants Highrise, Green Knight, SR&B, Bull Run and King Royalty; 7 U.S.C. § 6k(2) as to Defendants Highrise, Singh, Green Knight, Cologero, Bull Run, Rosseau, King Royalty, Raj, Sahdeo, and SR&B; 17 C.F.R. §§ 3.12 and

Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in the Complaint.  Accordingly, to prevent further dissipation of pool participant funds or the potential destruction of Defendants' records, the Commission moves for issuance of an emergency statutory restraining order ("SRO") with notice to enable the Court to grant full and effective relief by preserving the status quo, in particular by placing a freeze on assets held in the name of or controlled by Defendants Singh and the Corporate Defendants pending trial on the merits of this action, and preserving and granting the Commission immediate access to all Defendants' books and records.  In addition, the Commission moves for a preliminary injunction against Defendants continuing the emergency relief in the SRO and prohibiting, among other things, future violations of the Act and Regulations under which they have been charged.  In support of these motions, the Commission respectfully refers the Court to the memorandum set forth below and the exhibits in the Appendix filed simultaneously herewith.[4]

## II.    THE PARTIES

Plaintiff **Commodity Futures Trading Commission** (**"CFTC"** or **"Commission"**) is the independent federal regulatory agency charged with the administration and

---

5.3(a)(2)(ii) as to Defendants Singh, Cologero, Rosseau, Raj, and Sahdeo; 17 C.F.R. § 4.20(a)(l) and (b), as to Defendants Highrise, Singh, Green Knight, Cologero, Bull Run, Rosseau, King Royalty, Raj, SR&B and Sahdeo, and 17 C.F.R. § 4.21 as to Defendants Highrise, Singh, Green Knight, Cologero, King Royalty, Raj, Bull Run and Rosseau.

[4] In further support of its Emergency Motion for Statutory Restraining Order with Notice and its Motion for Preliminary Injunction, the CFTC submits with this Memorandum the Declaration of Joy H. McCormack (Ex. A), Senior Investigator for the CFTC and Stephanie Arnold, Senior Financial Investigator with the Office of Financial Regulation (OFR), State of Florida (Ex. B), and the exhibits attached thereto.  The materials have been redacted.  An unredacted version is available upon request for review by the Court.

enforcement of the Act, 7 U.S.C. §§ 1-26 (2018), and Regulations promulgated thereunder, 17 C.F.R. pts. 1-190 (2019).  The Commission maintains its principal office at 1155 21st Street NW, Washington, DC 20581, although this action is being prosecuted through its Chicago Regional Office at 525 West Monroe Street, Suite 1100, Chicago, Illinois 60661.

Defendant **Highrise Advantage, LLC ("Highrise")** is a Florida limited liability company with its business address in Orlando, Florida.  Highrise's articles of organization were filed with the State of Florida on February 13, 2013.  Highrise has never been registered with the Commission in any capacity.[5]  (McCormack Decl. ¶ 6.)

Defendant **Avinash Singh ("Singh")** is the founder, registered agent, principal member, and manager of Highrise Advantage, LLC.  Singh is a resident of Saint Cloud, Florida.  Singh opened at least 12 bank accounts in Highrise's name, in at least seven different financial institutions, and is the sole signatory on the bank and trading accounts in the name of Highrise.  Singh has never been registered with the Commission in any capacity. (McCormack Decl. ¶ ¶ 7, 38, 94.)

Defendant **Green Knight Investments, LLC ("Green Knight")** is a Florida limited liability company with its business address in Kissimmee, Florida.  Green Knight's articles of

---

[5] On September 2, 2014, Singh filed a notice of exemption with the National Futures Association (NFA) on behalf of Highrise claiming it was exempt from the requirement to register as a CPO pursuant to Regulation 4.13(a)(2), 17 C.F.R. § 4.13(a)(2) (2019).  This exemption has remained in effect since that date.  By filing for the exemption pursuant to Regulation 4.13(a)(2), Singh and Highrise affirmed that none of the pools operated by them has more than 15 participants at any time and that the total gross capital contributions it receives for units of participation in all of the pools it operates or that it intends to operate do not in the aggregate exceed $400,000.  Highrise collected more than $400,000 in gross capital contributions by at least September 20, 2016.  (McCormack Decl. ¶ 40.)  Because Highrise did not fit both of the requirements of Regulation 4.13(a)(2),  Highrise is not eligible for this exemption and should have been registered as a CPO no later than September 20, 2016.

organization were filed with the State of Florida on August 11, 2016.  Green Knight has never been registered with the Commission in any capacity.  (McCormack Decl. ¶ 8.)

Defendant **Daniel Cologero ("Cologero")** is the registered agent, manager, owner and operator of Green Knight.  Cologero is a resident of Kissimmee, Florida.  He solicited and accepted funds from pool participants for participation in the Green Knight Pool and transferred some of those funds to Highrise.  He is a signatory on Green Knight bank accounts.   Cologero has never been registered with the Commission in any capacity. (McCormack Decl. ¶ ¶ 9, 44-56.)

Defendant **SR&B Investment Enterprises, Inc**. **("SR&B")** is a Florida limited liability company with its business address in Miramar, Florida.  SR&B's articles of organization were filed with the State of Florida on February 18, 2009.  SR&B has never been registered with the Commission in any capacity.  (McCormack Decl. ¶ 10.)

Defendant **Surujpaul Sahdeo ("Sahdeo")** is the registered agent, principal and the president of **SR&B**.  Sahdeo is a resident of Miramar, Florida.  Sahdeo solicited and accepted funds from pool participants for participation in SR&B and transferred some of those funds to Highrise.  Sahdeo is the sole signatory on SR&B's bank accounts.  Sahdeo has never been registered with the Commission in any capacity.  (McCormack Decl. ¶ ¶ 11, 59-63.)

Defendant **King Royalty, LLC ("King Royalty")** is a New Jersey limited liability company with its business address in Jersey City, New Jersey.  King Royalty's articles of organization were filed with the State of New Jersey on May 8, 2013.  King Royalty has never been registered with the Commission in any capacity.  (McCormack Decl. ¶ 12.)

Defendant **Hemraj Singh ("Raj")** is the registered agent, principal and the president of King Royalty.  Raj is a resident of Jersey City, New Jersey.  He solicited and accepted funds from pool participants for participation in King Royalty and transferred some of those funds to Highrise.  He is the sole signatory on King Royalty's bank accounts.  Raj has never been registered with the Commission in any capacity.  (McCormack Decl. ¶ ¶ 13, 65-78.)

Defendant **Bull Run Advantage, LLC ("Bull Run")** is a Florida limited liability company with its business address in Melbourne, Florida.  Bull Run's articles of organization were filed with the State of Florida on November 8, 2017.  Bull Run has never been registered with the Commission in any capacity.  (McCormack Decl. ¶ 14.)

Defendant **Randy Rosseau ("Rosseau")** is the registered agent, principal and the manager of Bull Run.  He is a resident of Melbourne, Florida.  He solicited and accepted funds from pool participants for participation in Bull Run and transferred some of those funds to Highrise.  Rosseau is the sole signatory on Bull Run's bank accounts.  Rosseau has never been registered with the Commission in any capacity.  (McCormack Decl. ¶ ¶ 15, 80-91.)

III.    **JURISDICTION AND VENUE**

This Court has jurisdiction over this action under 28 U.S.C. § 1331 (2018) (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (2018) (U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2018), provides that U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive and other relief or to enforce compliance with the Act whenever it

shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2018), because Defendant Singh is found in and inhabits the Middle District of Florida, all Defendants have transacted business in this District, and certain of the acts and practices in violation of the Act and Regulations have occurred, are occurring, or are about to occur within this District.

IV.   **FACTS**

   A. **Overview of the Defendants' Forex Trading Scheme**

Highrise serves as a "master fund" entity in a "master-feeder" fund structure. As the "master" fund, Highrise directly and indirectly through feeder funds solicits money from pool participants to trade forex. At all times relevant hereto, Highrise pool participants deposited funds directly into Highrise or indirectly through one of four Feeder Pools (Bull Run, Green Knight, King Royalty, and SR&B), which deposited participant funds in Highrise. Highrise pooled the funds together, and commingled the pool participant funds with other non-pool participant funds. Highrise then transferred a portion of the pool participants' funds into forex trading accounts in Highrise's own name. (McCormack Decl. ¶ 21.)

**B. Defendant Highrise and Singh's Fraudulent Misrepresentations and False Statements Issued by Defendants Green Knight, King Royalty, and Bull Run**

**1. <u>Highrise</u>**

As early as 2013, Singh claimed to be a professional trader with over 10 years of forex trading experience.  (McCormack Decl. ¶ 7.)  Singh has admitted that he accepts funds from investors for trading forex.  (McCormack Decl. ¶ 25; Arnold Decl. ¶ 4.)  During the period from at least January 2016 to March 2020, Singh, through Highrise, solicited and accepted more than $4,750,000 from individual pool participants and from the Feeder Pools.  (McCormack Decl. ¶ 39.)  In soliciting investor funds for his fraudulent operation, Singh told a prospective pool participant that he was a commodity trader, had several pools and investors, and falsely, that those investments were low risk and had a track record of positive gains with no loss.  (McCormack Decl. ¶¶26, 35; Arnold Decl. ¶ 7.)

Singh provided at least some of the prospective investors a client information form and contract.  (McCormack Decl. ¶ 25; Arnold Decl. ¶ 4.)  At least some of these contracts specified that the participants' funds would be "traded on FOREX only" and provided that the pool participant was required to pay to Highrise a fee of 50% of the individual pool participant's purported profit per positive trading month for reimbursement of Highrise's ordinary administrative expenses.  (McCormack Decl. ¶ 107.)

Highrise also sent its pool participants monthly account statements via e-mail.  (*Id*. at ¶115.)  The monthly statements contained information about the participant's opening balance, profit, deposits, withdrawals, and account balance.  (*Id*.)  They never showed losses. The monthly statements did not provide the Master Pool's account activity, profits, losses,

net balances, or the participation units of the participant.  (*Id*.)  These statements were false.

For instance, the statements at least one participant received showed profits for a given

month that were larger than the entire actual forex trading profits of the Master Pool or

showed account balances that were larger than the forex account balances of the entire

Master Pool.  (*Id*. at ¶¶116-121.)

Highrise also sent monthly statements to at least one of the four feeder pools, Green

Knight.  (*Id*. at ¶21.)

## 2.  __Green Knight__

By at least September 2016, Green Knight began to transfer funds from pool

participants of the Green Knight pool to the Master Pool for the purpose of forex trading.

(McCormack Decl.  ¶43.)  Based on bank account records for Green Knight for the time

period between January 2017 and September 2019, Green Knight received at least $570,000

in funds from at least 41 Green Knight pool participants and transferred at least that amount

to Highrise.  (*Id*. at ¶55.)  Cologero marketed Green Knight through word of mouth as a

successful private investment club.  (*Id*. at ¶44; Arnold Decl. ¶14.)  He instructed prospective

pool participants to sign contracts with Green Knight and represented to them that their funds

would be used to trade forex through a trader known to Cologero, but whose identity would

not be disclosed to the participant.  (McCormack Decl. ¶44; Arnold Decl. ¶¶12, 14.)

Green Knight pool participants all received a contract that provided that pool

participant funds are "traded on FOREX only."  (McCormack Decl. ¶47.)  The contract also

provided that the pool participant was required to pay to Green Knight a "performance fee"

of 25% of the individual pool participant's profit per positive trading month for Green

Knight's management services and profit.  (*Id*. at ¶48.)  For pool participants that deposited

through Green Knight, Highrise took 50% of the pool participant's purported monthly profit.

(*Id*.)  Green Knight then took its 25% performance fee from the purported profit amount that

remained after Highrise deducted its 50% fee.  (*Id*.)  The contract provided to pool

participants did not disclose that Highrise took 50% of the purported profits before Green

Knight took its 25% fee.  (*Id*.)  As a result of this fee structure, Green Knight pool

participants were entitled to only 25% of the pool participant's pro rata share in trading

profits.  (*Id*.)

On a monthly basis, Green Knight also provided its pool participants a monthly

statement showing their purported profits.  (*Id*. at ¶49.)  This monthly statement did not

reflect the deduction of the 50% fee taken by Highrise and the 25% fee taken by Green

Knight from the individual pool participant's profit.  (*Id*.)  Green Knight also issued

newsletters to the pool participants that touted consistent profits, with an average monthly

return of over 5%.  (*Id*. at ¶52.)

### 3.  **King Royalty**

By at least January 2015, King Royalty began to transfer funds to Highrise.

(McCormack Decl ¶77.)  Between at least January 2015 and February 2019, bank account

records for King Royalty show that King Royalty received $1,300,000 in funds from at least

63 King Royalty pool participants and transferred at least the same amount to Highrise to

invest in forex trading.  (*Id*.)  King Royalty used the same bank accounts to pool its

participant deposits as it did to pay for expenses not related to forex trading.  (*Id*. at ¶78.)

Raj marketed King Royalty through word of mouth and held himself out as a successful individual leading a group of traders that traded forex.  (*Id*. at ¶65.)  In his website https://kingrajsingh.com/, Raj refers to himself as "The Passive Income Artiste."  (*Id*.)  On the website Raj states that his "mission is to empower others to overcome and generate passive income to create financial freedom and experience life to the fullest."  (*Id*.)  Beginning in or around June 2015, Raj told a prospective pool participant that he has a group of traders at Highrise that trade forex for him.  (*Id*. at ¶66.)  Raj told the prospective pool participant that the funds being provided to King Royalty were being pooled with other participants' funds and used to invest in forex and nothing else.  (*Id*. at ¶72.)  Raj also stated that the investment opportunity is better than others because the traders completely close out the trades at the end of each month, and that there have been three years of consistent profits. (*Id*. at ¶66.)  Raj told the prospective pool participant that they could expect profit of about 30% per year from their participation in the King Royalty commodity pool.  (*Id*.)  The prospective pool participant decided to participate in the pool and transferred funds to King Royalty.  (*Id*. at ¶67.)  Prior to their investment with King Royalty, this pool participant (hereinafter "Pool Participant #1") had about 1 year of experience trading securities and no experience trading or investing in forex.  (*Id*.)

Pool participants received monthly pool statements from Raj via email.  (*Id*. at ¶¶70, 74.)  The King Royalty monthly statements only show profits, never losses.  (*Id*.)  For example, Pool Participant #1 received account statements that have shown forex trading profits of about 3% every month with no reported losses.  (*Id*. at ¶70.)  Based on receiving profitable trading statements, Pool Participant #1 decided to make additional contributions to

11

the pool.  (*Id*. at ¶71.)  Over time, Pool Participant #1 invested more than $50,000 in King

Royalty.  (*Id*.)  Pool Participant #1 believed the profits were being shared with Raj and the

traders, but did not know how much Raj or the traders were charging as fees.  (*Id*. at ¶73.)

### 4. **Bull Run**

By at least February 2019, Bull Run began to transfer funds to Highrise.  (*Id*. at ¶90.)

Between at least February 2019 and July 2019, bank account records for Bull Run show that

Bull Run received at least $82,000 in funds from at least nine Bull Run pool participants and

transferred at least $75,000 of it to Highrise.  (*Id*.)  Bull Run used the same bank accounts to

pool its participant deposits as it did to pay for expenses not related to forex trading.

(McCormack Decl. ¶91.)

Rosseau told prospective pool participants that he knew a trader that traded forex and

that profit margin averages were 4-5% a month.  (*Id*. at ¶80.)  Rosseau told another

prospective participant that the trader had made great gains trading forex, even when the

market was down.  (*Id*. at ¶ 85.)  Rosseau also provided this prospective participant with

names of individuals who he claimed invested and made profitable returns.  (*Id*. at ¶85.)  The

prospective pool participant decided to participate and transferred more than $15,000 in

funds to Bull Run.  (*Id*. at ¶ 86.)

Rosseau emailed pool participants that deposited directly with Bull Run monthly

account statements via e-mail.  (*Id*. at ¶87.)  The Bull Run monthly statements only show

profits, never losses.  (*Id*.)

### C.  Defendant Highrise and Singh Misappropriated Pool Participant Funds

Of the at least $4,750,000 received by Highrise from pool participants, Highrise used only a combined amount of $1,656,000 for forex trading.  (McCormack Decl. ¶ 94.)

Highrise deposited only a portion of those funds, $657,000, in the forex trading accounts it maintained at a retail foreign exchange dealer, RFED1.  (*Id*.)  Highrise withdrew $169,000 from the RFED1 forex trading accounts and deposited those funds in Highrise bank accounts.  (*Id*.)  Highrise gained approximately $160,000 by trading forex through RFED1 and it had combined balances of approximately $650,000 in RFED1 as of April 2020.  (*Id*.)  Of the 39 months of forex trading by Highrise, there were at least 15 months with net trading losses for the period.  (*Id*.)  For months with net trading profits, average monthly profits were $6,376 and for the losing months, average monthly losses were $6,623.  (*Id*.)

Highrise also deposited $999,000 in its forex trading accounts at foreign RFEDs.[6] (*Id*. ¶ 101.)  Of this amount, Highrise and/or Singh withdrew approximately $600,000 from the foreign RFED forex trading accounts and deposited those funds in Highrise and/or Singh bank accounts.  (*Id*.)  Upon information and belief, approximately $400,000 was either lost trading through the foreign RFEDs or remains as balances in those accounts.  (*Id*.)

Highrise and Singh misappropriated at least $3,000,000 of the pool participants' funds to pay for, among other things, Singh's personal expenses and to make Ponzi-type payments to pool participants, in addition to payments to feeder fund entities.  For example, over $1,500,000 was used to pay for transactions that are not directly related to forex trading

---

[6]Records from the foreign RFEDs are being requested by the Commission.  These estimates are based on currently available Highrise corporate bank records.  (*Id*. ¶ 101.)

including payments for travel, car costs, professional services, retail purchases, phone bills, marketing, home and personal costs, events, dining, and other miscellaneous expenses.  (*Id.* ¶105.)

In the time period between 2017 and 2019 the Highrise trading accounts earned only roughly $160,000 in trading profits.  Even assuming that the 50% in administrative fees mandated by Highrise's contract with pool participants is legitimate, Highrise's earnings in fees for that time period would only amount to $80,000.  (*Id.* at ¶ 109.)  And yet between a similar time period, from January 2017 and April 2020, payments made from Highrise bank accounts to a credit card account Singh opened in the name of Highrise exceeded $1.5 Million.  (*Id.* at ¶¶110, 111.)  Because the gathering and analysis of bank and credit card accounts is ongoing, the Commission does not yet have a complete picture of all the ways in which Highrise and Singh used investor money.  (*Id.* at ¶ 23.)  However, the following are a few examples from just credit card account 1005 of Singh's use of Highrise pool participant funds for purposes other than trading forex: between January 2017 and April 2020: $1,350,000 was spent on travel, car costs, professional services, retail purchases, phone bills, virtual office costs, marketing, miscellaneous expenses, home and personal costs, fees payments to feeder fund entities and their associates, events and dining.  (*Id.* at ¶ 112.)

Records for this account also reflect that for the time period between January 2017 and April 2020, over $50,000 was transferred from this account to Green Knight and over $314,000 to King Royalty.  And for the same time period, the same account was used to pay for Singh's personal expenses including pest control, house cleaning services, and medical costs.  (*Id.* at ¶ 113.)

**D.  SR&B is responsible for over 50% of the customers impacted in the scheme**

SR&B began to transfer funds to Highrise by at least March 2015.  (McCormack Decl.  ¶60.)  While the CFTC is still in the process of gathering and analyzing bank records, the evidence from even the limited records it has analyzed shows that SR&B transferred a total of at least $1.35 million of at least 77 customers' funds to Highrise for forex trading. (Id. at ¶ 60.)  The records also show that SR&B used the same bank accounts to pool its participant deposits as it did to pay for expenses not related to forex trading.  (*Id*. at ¶ 63.)

Based on the evidence gathered to date, SR&B has contributed around 30% of the customer funds sent to Highrise, a fraudulently run commodity pool that invested only at most 35% of the customer funds entrusted to it to trading.  With at least 77 customers whose funds were transferred to Highrise, out of the at least 150 participants identified to date, SR&B solicited and accepted funds from over 50% of the customers impacted by this scheme.

**E.  Defendants Committed Registration and Regulatory Violations**

**1.  Defendants Failed to Register with the Commission**

The Corporate Defendants—by and through their officers, employees or agents—are using  the mails, electronic mails, wire transfers, websites, and other means or instrumentalities of interstate commerce to solicit pool participants and prospective pool participants and to receive property from pool participants.  (McCormack Decl. at ¶ ¶36, 49, 62, 70,87.)  They are acting as CPOs because they are entities engaging in a business that is of the nature of a commodity pool and, in connection with that business, are soliciting and/or

accepting pool funds for a pooled investment vehicle that engages in retail forex transactions. (*Id*. at ¶ 21.)  Despite acting in a capacity that requires registration, the Corporate Defendants are not registered with the Commission as CPOs.  (*Id*. at ¶¶ 6,8,10,12,14.)

Likewise, Singh, Cologero, Sahdeo, Raj and Rosseau should be registered as associated persons ("APs") of CPOs because they are soliciting funds or property for participation in pooled investment vehicles that engages in retail forex transactions.  (*Id*. at ¶¶ 26,35,44,58,65,80.)  But they have never registered with the Commission as APs of CPOs. (*Id*. at ¶¶ 7,9,11,13,15.)

### 2.  Defendants Failed to Receive Funds in the Name of Separate Legal Entities

The Corporate Defendants have not formed separate legal entities for their commodity pools, have not operated them as separate legal entities, and have used bank accounts that hold pool participant funds for items not related to forex trading.  (McCormack Decl. ¶¶ 21, 56,63, 78,91,105.)

### 3.  Defendants Failed to Provide Risk Disclosures

Defendants Highrise, Green Knight, Bull Run and King Royalty failed to provide pool participants with required disclosures.  (McCormack Decl. ¶¶ 22, 30, 51, 75,88.)  The agreements Highrise and Green Knight provided to participants contain limited disclosures relating to trading risks, but do not include the required cautionary statement to pool participants or the full and complete risk disclosures as required.  In addition to Defendants' inadequate cautionary statements and risk disclosures, Defendants also failed to provide pool participants with additional required information, including but not limited to the fees and

expenses incurred by Highrise and the Feeder Pools, and past performance disclosures.  (*Id.* at 30-32, 49, 70,73,75,87,88.)  Accordingly, Highrise, Green Knight, Bull Run and King Royalty violated Regulation 4.21.

## V.      THE ARGUMENT

### A.  Defendants Violated the Act and Commission Regulations

#### 1.  Defendants Singh and Highrise Committed Fraud in Violation of Section 4b(a)(2)(A)-(C) of the Act and Commission Regulation 5.2(b) by Misappropriation, Fraudulent Solicitation and False Statements (Count 1)

Section 4b(a)(2)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(2)(A)-(C) (2018), makes it unlawful

> [F]or any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery . . . that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—(A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person[.]

Section 4b of the Act applies to forex transactions with non-eligible contract participants (non-"ECPs")[7] pursuant to Section 2(c)(2)(C)(iv) of the Act, 7 U.S.C.

---

[7] An ECP is generally defined in Section la(l8) of the Act, 7 U.S.C. § la(l8)(xi) (2018), as an individual who has total assets in an amount in excess of (i) $10 million or (ii) $5 million and who enters into the transaction to manage risk.  At least some, if not all, of the pool participants in Highrise and the commodity pools that fed funds to Highrise were not ECPs. ( McCormack Decl. ¶¶41, 42, 53.)

§ 2(c)(2)(C)(iv).  Regulation 5.2(b)(1)-(3), 17 C.F.R. § 5.2(b)(1)-(3) (2014), mirrors the

requirements of Section 4b(a)(2)(A)-(C) of the Act but applies specifically to forex

transactions with non-ECPs.

Defendant Singh and his company Highrise, through Singh's acts, omissions and

failures, have committed fraud in connection with forex trading including, by among other

things, misrepresenting the performance of the Master Pool, issuing Monthly Statements to

individual pool participants that deposited funds directly with Highrise and to at least one

Feeder Pool that contained false information about the profits and balances of the individual

pool participant's respective interests in the Master Pool and the Feeder Pool's respective

interests in the Master Pool, and misappropriating pool participant funds.

### a.   Defendants Singh and Highrise Committed Fraud by Misappropriation

During the Relevant Period, Defendants Singh and Highrise misappropriated at least

$3 million of pool participant funds.  The misappropriated funds were used to pay for, among

other things, personal expenses and to make Ponzi-type payments.  (McCormack Decl. ¶¶

104-113.)

"Misappropriation of participant funds constitutes 'willful and blatantly fraudulent

activity' that violates the anti-fraud provisions of the CEA."  *CFTC v. Allied Markets LLC*,

371 F. Supp. 3d 1035, 1048 (M.D. Fla. 2019)  (quoting *CFTC v. Noble Wealth Data Info.

Servs., Inc.*, 90 F. Supp. 2d 676, 687 (D. Md. 2000), *aff'd sub nom. CFTC v. Baragosh*, 278

F.3d 319 (4th Cir. 2002)); s*ee also CFTC v. Allied Markets LLC,* , 2019 WL 4921125, at *1

(M.D. Fla. June 28, 2019), *report and recommendation adopted*, , 2019 WL 4918433, at *1,

10 (M.D. Fla. Oct. 4, 2019) (determining that defendants violated Section 4b of the Act by spending customers' money on personal expenses that should have been used to trade forex on behalf of the customers); *CFTC v. Machado*, No. 11-22275-CIV, 2012 WL 2994396, at *6 (S.D. Fla. Apr. 20, 2012) (same); *In re Slusser*, CFTC No. 94-14, 1999 WL 507574, at *12 (July 19, 1999) (determining that respondents violated Section 4b of the Act by surreptitiously retaining money in their own bank accounts that should have been traded on behalf of investors*), aff'd in relevant part sub nom. Slusser v. CFTC*, 210 F.3d 783 (7th Cir. 2000).

### b.  Defendants Singh and Highrise Made Fraudulent Misrepresentations

To establish that the Defendants Singh and Highrise violated Section 4b(a)(2)(A)–(C) of the Act and Regulation 5.2(b) by making misrepresentations and omissions of material fact, the Commission must prove that: (1) a misrepresentation or misleading statement was made, or that the Defendants failed to disclose a fact; (2) the misrepresentation, statement or omission was material; and (3) that it was made with scienter.  *CFTC v. R.J. Fitzgerald & Co., Inc.,* 310 F. 3d 1321, 1328 (11th Cir. 2002) (citations omitted), *cert. denied*, 543 U.S. 1034 (2004).

All three elements can be established against Singh and Highrise.  "Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'"  *R.J. Fitzgerald & Co.*, 310 F.3d at 1328 (citing *Hammond v. Smith Barney Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 at 36,657 & n.12 (CFTC Mar. 1, 1990) *see also CFTC*

*v. Rolando,* 589 F. Supp. 2d 159, 169 (D. Conn. 2008) (providing false account statements to customers that misstated the value of and trading activity in their accounts violates section 4b(a) of the Act); *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 448 (D.N.J. 2000) (holding that false reporting of account balances violates the Act's anti-fraud provisions); *Noble Wealth,* 90 F. Supp. 2d at 686*; CFTC v. McLaurin*, No. 95-C-285, 1996 WL 385334, at *10-12 (N.D. Ill. July 3, 1996) (by reporting the existence of trading profits when none were actually earned and by overstating the account balances, defendant issued false reports or statements in violation of Section 4b(a) of the Act); *CFTC ex rel. Kelley v. Skorupskas*, 605 F. Supp. 923, 932-33 (E.D. Mich. 1985) (defendants violated Section 4b of the Act by issuing false monthly statements to customers).

### i.    Misrepresentations

As detailed in the Complaint, Singh omitted telling potential and existing pool participants the fact that he had misappropriated pool participant funds for his personal use. Singh also told a prospective pool participant that his investments for commodity pool investors were low risk and had a track record of positive gains with no loss.  (McCormack Dec; at ¶¶ 26, 35.)

Defendants Singh and Highrise also violated Section 4b(a)(2)(B) of the Act by creating false account statements and issuing those statements to customers.  Highrise issued Monthly Statements with false information, including false balances and profits, to existing pool participants.  On numerous occasions, the Monthly Statements showed profits for a given month that were larger than the entire actual forex trading profits of the Master Pool or

showed account balances that were larger than the forex account balances of the entire

Master Pool.  (*Id.* at ¶¶ 117-126.)

### ii.    Defendants Singh and Highrise's Misrepresentations Were Material

A representation or omission is material if there is a substantial likelihood a

reasonable investor would consider it "important in deciding whether to make an

investment." *CFTC v. Hunter Wise Commodities*, LLC, 749 F.3d 967, 981 (11th Cir. 2014)

(quoting *R.J. Fitzgerald & Co.,* 310 F. 3d at 1328-1329); *CFTC v. Matrix Trading Grp., Inc*.,

No. 00-8880-CIV, 2002 WL 31936799, at *5 (S.D. Fla. Oct. 3, 2002) (citing *R&W Technical

Serv. Ltd. v. CFTC*, 205 F. 3d 165 (5th Cir. 2000)); *CFTC v. Fleury*, No. CIV.A. 03-61199,

2010 WL 5146283, at *15 (S.D. Fla. June 18, 2010) (citing *Noble Wealth,* 90 F. Supp. 2d at

686).  Any fact that enables customers to assess independently the risk inherent in their

investment and the likelihood of profit is a material fact.  *In re Commodities Int'l Corp.,*

CFTC No. 83-43, 1997 WL 11543, at *9 (Jan. 14, 1997).

The misrepresentations Singh and Highrise made to their pool participants and the

facts they failed to tell their pool participants were material.  A reasonable customer would

want to know that the Defendants did not trade a significant portion of their funds in forex

trading and, instead, misappropriated funds.  *See Rosenberg,* 85 F. Supp. 2d at 447-48

(finding reporting of erroneous account balances are material misrepresentations that a

reasonable investor would consider important); *Skorupskas,* 605 F. Supp. at 932-933 (finding

that defendant's failure to make trades in accordance with her representations, and issuance

of false monthly statements constituted fraud in violation of the Act).  Similarly, a reasonable

investor would want to know that Singh had a track record that included losses.

### iii.    Defendants Singh and Highrise Acted With Scienter

The scienter element is established when an individual's conduct involves intentional

omissions or misrepresentations that present a risk of misleading customers, either known to

the defendant or sufficiently manifest that the defendant must have been aware of the risk.

*R.J. Fitzgerald & Co.,* 310 F. 3d at 1328; *Wasnick v. Refco., Inc.,* 911 F. 2d 345, 348 (9th

Cir. 1990).  In order to meet the scienter requirement, the Commission must demonstrate that

a defendant's conduct was either reckless or intentional.  *R. J. Fitzgerald & Co.*, 310 F.3d at

1328-29 (intent to defraud, manipulate, or deceive, or conduct that represents an extreme

departure from the standards of ordinary care establishes scienter); *CFTC v. Driver*, 877 F.

Supp. 2d 968, 977 (C.D. Cal. 2012), *aff'd*, 585 F. App'x 366 (9th Cir. 2014) ("Proof of

scienter requires evidence that a Defendant committed the alleged wrongful acts

intentionally, or that the representations were made with a reckless disregard for their truth or

falsity.") (internal citations and quotations omitted); *Drexel Burnham Lambert, Inc. v. CFTC*,

850 F. 2d 742, 748 (D.C. Cir. 1988) (finding that recklessness is sufficient to satisfy scienter

requirement).  To prove that conduct is intentional, the Commission need only show that a

defendant's actions were "intentional as opposed to accidental."  *Lawrence v. CFTC,* 759 F.

2d 767,773 (9th Cir. 1985).  To prove that conduct is reckless, the Commission must show

that it "departs so far from the standards of ordinary care that it is very difficult to believe the

[actor] was not aware of what he was doing."  *Drexel Burnham Lambert*, 850 F. 2d at 748

(alteration in original) (internal quotation marks and citation omitted); *see also Rosenberg*, 85 S. Supp. 2d at 448 (holding that recklessness is sufficient to satisfy the scienter requirement).

Singh and Highrise, through its controlling person, Singh, acted with the requisite scienter as they intentionally committed the alleged wrongful acts, but, at the very least, were reckless in doing so.  Among other things, Singh pooled participant funds in bank accounts which were under his sole control and then misappropriated a substantial percentage of those funds.  (McCormack Decl. ¶¶ 104-113).  As discussed above, Singh also generated false account statements which were emailed to the Master Pool participants and given to at least one Feeder Pool.  Defendants Highrise and Singh knew, or acted with reckless disregard for their truth or falsity, that Singh's representations regarding the disposition of pool participants' funds, the results of trading on behalf of pool participants, and the account statements he sent to pool participants and at least one Feeder Pool were all false.

## 2. Defendants Highrise Green Knight, Bull Run, King Royalty, Singh, Cologero, Rosseau and Raj Violated Section 4*o*(1)(A) and/or (B) of the Act (Counts 2 and 3)

Section 4*o*(1)(A) and (B) of the Act, in relevant part, makes it unlawful for a commodity trading advisor (" CTA") or CPO, by use of the mails or any other means of interstate commerce, directly or indirectly, to:  (A) employ any device, scheme, or artifice to defraud any customer; or (B) engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any customer.  "Section 4*o*(1) of the Act broadly prohibits fraudulent conduct by a [CTA or CPO]" and "applies to all [CTAs or CPOs] whether registered, required to be registered, or exempted from registration."  *CFTC v. Weinberg*, 287

F. Supp. 2d 1100, 1107-08 (C.D. Cal. 2003) (citing *Skorupskas*, 605 F. Supp. at 932-33); *see also CFTC v. Vartuli,* 228 F.3d 94, 103 (2d Cir. 2000) (Defendant met the statutory definition of a CTA and violated the fraud provisions, which apply to CTAs irrespective of whether they are "exempt from registration under the Act."); Commission Regulation 4.15, 17 C.F.R. § 4.15 (2019) ("The provisions of Section 4*o* of the Act shall apply to any person even though such person is exempt from registration under this Part 4, and it shall continue to be unlawful for any such person to violate Section 4*o* of the Act.").

Section 1a(11) of the Act, 7 U.S.C. § 1a(11) (2018), defines a CPO as, among other things, any person engaged in a business that is of the nature of a commodity pool and who solicits, accepts, or receives from others, funds, securities, or property for the purpose of trading commodity interests.  For forex transactions, a CPO is defined in Regulation 5.1(d)(1), 17 C.F.R. § 5.1(d)(1) (2019), as "any person who operates or solicits funds, securities, or property for a pooled investment vehicle that is not an ECP as defined in section 1a(18) of the Act, and that engages in retail forex transactions."

Defendants Highrise, Green Knight, Bull Run and King Royalty acted as CPOs by operating and soliciting funds for pooled investments created for the purpose of trading retail forex transactions for the benefit of pool participants.  At least some of the pool participants were not ECPs.  (McCormack Decl. ¶ ¶ 21,41,42,53.)  Moreover, Defendants Singh, Cologero, Rosseau and Raj acted as AP[8]s of their respective CPOs by soliciting individuals

_____

[8]Regulation 1.3, 17 C.F.R. § 1.3 (2019), defines an "Associated Person" or AP of a CPO as any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves:  (i) the solicitation of funds, securities or property for participation in a commodity pool or (ii) the supervision of any person or persons so engaged.

to become pool participants in a pooled investment that engages in retail forex transactions. (McCormack Decl. ¶ ¶26,35,44,58,65,80.)

The same conduct that constitutes violations of Section 4b can constitute violations of Section 4*o*(1).  *In re R&W Technical Servs.*, CFTC No. 96-3, 1999 WL 152619, at *25 (March 16, 1999) (since the CFTC found that respondent violated Section 4b(a) of the Act, no further analysis was needed to conclude that respondent also violated Section 4*o*(1)). Consequently, while acting as a CPO, and AP of a CPO, Defendants Highrise and Singh violated Section 4*o*(1)(A) of the Act by engaging in the same fraudulent acts by which they violated Section 4b(a)(2)(A)-(C) as described above.

Defendants Highrise and Singh have also violated Section 4*o*(1)(B) of the Act by engaging in transactions, practices and a course of business which operated as a fraud or deceit upon pool participants while acting as a CPO, and an AP of a CPO.  While scienter must be established to prove violations of Section 4b of the Act, scienter is not an element required to be established in order to prove violations of Section 4*o*(1)(B) of the Act.  *Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 677 (11th Cir. 1988) ("[W]e conclude that Section 6*o*(1)(a) contains the same *scienter* requirement as Section 10(b) and rule 10b-5 of the federal securities laws, while Section 6*o*(1)(B) does not require proof of scienter."); *In re Kolter*, CFTC No. 93-19, 1994 WL 621595 at *7 (Nov. 8, 1994).

Green Knight, Bull Run, and King Royalty (acting as CPOs) and Cologero, Raj, and Rosseau (acting as APs), through the use of the mails or other means of instrumentalities of interstate commerce (including through the use of electronic mail with prospective and existing pool participants) violated Section 4*o*(1) (B) of the Act, by, among other things,

representing that funds deposited with their respective Feeder Pools would be traded in forex, which was not true, and sending fraudulent account statements to their respective pool participants.  (McCormack Decl. ¶¶ 49, 70, 87.)  These actions operated as a fraud or deceit upon participants in violation of Section 4*o*(1) (B).

### 3.  Defendants Violated Section 4m(1) of the Act and Regulation 5.3(a)(2)(i) (Count 4)

Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2018), in relevant part, makes it unlawful "for any . . . commodity pool operator, unless registered, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as such . . . commodity pool operator . . . ."

Similarly, Regulation 5.3(a)(2)(i), 17 C.F.R. § 5.3(a)(2)(i) (2019), makes it unlawful for any CPO, as defined in Regulation 5.1(d)(1), to be engaged in retail forex transactions without being so registered.

As set forth in Section VA2 above, Defendants Highrise, Green Knight, Bull Run and King Royalty acted as CPOs in connection with the activities alleged in the Complaint. SR&B also acted as a CPO by receiving funds for the purpose of retail forex trading. (McCormack Decl. ¶ 60.)  Defendants Highrise, Green Knight, SR&B, Bull Run and King Royalty violated Section 4m(1) of the Act and Regulation 5.3(a)(2)(i) because, during the Relevant Period, they were not registered, used the instrumentalities of interstate commerce

in connection with their business as CPOs and accepted funds for a pooled investment from non-ECPs for the purpose of engaging in retail forex transactions[9].

> **4. Defendants Singh, Cologero, Sahdeo, Rosseau and Raj Violated Section 4k(2) of the Act and Regulations 3.12, 5.3(a)(2)(ii) by Acting As APs of a CPO, Without Registering as Such and Highrise, Green Knight, SR&B, Bull Run, and King Royalty Violated those Sections and Regulations by Permitting their Respective APs to Act in an Unregistered Capacity (Count 5)**

Section 4k(2) of the CEA, 7 U.S.C. § 6k(2) (2018), and CFTC Regulation 5.3(a)(2)(ii), 17 C.F.R. § 5.3(a)(2)(ii) (2019), require registration with the Commission for any person who is associated with a CPO as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity that involves the solicitation of funds, securities, or property for participation in a commodity pool or the supervision of any person or persons so engaged.  Section 4k(2) of the CEA, 7 U.S.C. § 6k(2)(2018), also makes it unlawful for any CPO to permit any person not registered with the CFTC as required to become or remain associated with the CPO in any capacity when the CPO knew or should have known that such person was not registered with the CFTC or that such registration had expired, been suspended (and the period of suspension has not expired), or been revoked.  CFTC Regulation 3.12, 17 C.F.R. § 3.12 (2019), prohibits any person from being associated with a CPO as an associated person unless that person shall have registered with the CFTC as an associated person of that sponsoring CPO.  Section 2(c)(2)(C)(iii)(I)(cc) of the CEA, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(cc) (2018), makes it unlawful

---

[9] Although Highrise filed a notice of exemption from CPO registration in 2014, it did not qualify for that exemption at least by September 2016.  (McCormack Decl. at ¶ 6.)

for any person, unless registered in such capacity as the CFTC shall determine, to operate or solicit funds, securities, or property for any pooled investment vehicle that is not an ECP in connection with leveraged or margined forex transactions.

Singh, Cologero, Sahdeo, Rosseau and Raj acted in capacities that involved, in relevant part, the solicitation of funds, securities, or property for participation in a commodity pool.  (McCormack Decl. ¶ ¶ 26,35,44,58,65,80.)  As such, they acted as APs of their respective CPOs without the benefit of registration in violation of Section 4k(2) of the Act and Regulations 3.12 and 5.3(a)(2)(ii).  Further, in permitting their respective APs to do so, Highrise, Green Knight, SR&B,  Bull Run and King Royalty also violated Section 4k(2), 7 U.S.C. §  6k(2) (2018).

### 5. Defendants Violated Regulation 4.20(a)(1),(b) By Failing to Operate their Respective CPOs as Separate Legal Entities (Count 6)

Regulation 4.20(a)(1), 17 C.F.R. § 4.20(a)(1) (2019) ,[10] requires a CPO to "operate its pool as an entity cognizable as a separate legal entity from that of the pool operator." Regulation 4.20(b), 17 C.F.R. §§ 4.20(b) (2019), further provides that the CPO receive funds from existing or prospective participants in the pool's name.  *See, e.g.*, *CFTC v. Am. Bullion Exch. ABEX, Corp. ("Am. Bullion")*, No. SACV 10-1876-DOC (RNBx), 2014 WL 12603558, at *5 (C.D. Cal. Sept. 16, 2014) (default order) (finding CPOs violated Regulations 4.20(a)(1) and (b) when they failed to operate pool as separate legal entity and received pool funds in a name other than that of the pool).

---

[10]Regulation 5.4, 17 C.F.R. § 5.4 (2019), states that Part 4 of the Regulations, 17 C.F.R. pt. 4 (2019), applies to any person required to register as a CPO pursuant to Part 5 of the Regulations, 17 C.F.R. pt. 5 (2019), relating to forex transactions.

All of the Corporate Defendants received participants' funds in their names, rather than in separate pool accounts and did not maintain their pools as separate legal entities. (McCormack Decl. ¶ 21.)  By such actions, these Defendants failed to operate the pools as separate legal entities and failed to properly deposit participants' funds in violation of Regulation 4.20(a)(1) and (b).

As discussed in Section VA7b, below, Defendants Singh, Cologero, Sahdeo, Rosseau, and Raj respectively control Highrise, Green Knight, SR&B, Bull Run and King Royalty, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, the conduct alleged in the Complaint, including in Count 6.  Therefore, pursuant to 7 U.S.C. §  13c(b), Singh, Cologero, Sahdeo, Rosseau, and Raj are respectively liable for Highrise, Green Knight, SR&B, Bull Run and King Royalty's violations of 17 C.F.R. §  4.20(a)(l) and, (b).

### 6. Defendants Highrise, Green Knight, Bull Run and King Royalty Failed to Provide Pool Participants with Required Pool Disclosures in Violation of Regulation 4.21 (Count 7)

Defendants Highrise, Green Knight, Bull Run and King Royalty failed to provide pool participants with required disclosures.  Regulation 4.21(a)(1), 17 C.F.R. § 4.21(a)(1) (2019), provides that:

> [E]ach commodity pool operator registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with §§ 4.24 and 4.25 by no later than the time it delivers to the prospective participant a subscription agreement for the pool . . . .

Regulation 4.24, 17 C.F.R. § 4.24 (2019), details twenty-three types of general disclosures required for pools.  Regulation 4.25, 17 C.F.R. § 4.25 (2019), details the performance disclosures required for pools, including performance disclosures for different points in time in the pool's operating history.

Defendants Highrise, Green Knight, Bull Run and King Royalty failed to provide prospective pool participants with a pool disclosure document in the form specified in Regulations 4.24 and 4.25.  (McCormack Decl. ¶ 22, 30-32, 49, 51, 70, 73, 75, 88.) Accordingly, Highrise, Green Knight, Bull Run and King Royalty violated Regulation 4.21. *See, e.g., Am. Bullion*, 2014 WL 12603558, at *7 (finding CPOs violated Regulation 4.21 when they failed to provide a required disclosure document).

### 7.  Principal-Agent and Controlling Person Liability

#### a.  Principal-Agent

Section 2(a)(1)(B) of the Act, 7 U.S.C. 2(a)(1)(B) (2018), and Regulation 1.2, 17 C.F.R. § 1.2 (2019), provide that the "act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person."

In determining liability under Section 2(a)(l)(B) of the Act and Regulation 1.2, the Court of Appeals for the Eleventh Circuit applies a common law test for actual agency, either implied or express, which requires:  (1) consent to the agency by both principal and agent;

and (2) the control of the agent by the principal.  *CFTC v. Gibraltar*, 575 F. 3d 1180, 1188-89 (11th Cir. 2009).

Here, the violative conduct of Singh, Cologero, Raj, Sahdeo and Rosseau and other employees and agents acting on behalf of the Corporate Defendants, occurred within the scope of their employment.  (McCormack Decl. ¶¶ 6-15.)  Therefore, the Corporate Defendants are liable for the acts of Singh, Cologero, Raj, Sahdeo and Rosseau pursuant to Section 2(a)(1)(B) and Regulation 1.2.

### b.  Controlling Person Liability

Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2018), provides that a defendant who possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of an entity may be liable as a controlling person of that entity, provided that the defendant either knowingly induces, directly or indirectly, the violative acts or fails to act in good faith.  *R.J. Fitzgerald & Co.*, 310 F.3d at 1334; *Monieson v. CFTC*, 996 F.2d 852, 858–860 (7th Cir.1993).  "A fundamental purpose of Section 13(b) is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself."  *R.J. Fitzgerald & Co.*, 310 F.3d at 1334 (quoting *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995)).  The statute is "remedial, to be construed liberally, and requir[es] only some indirect means of discipline or influence short of actual direction to hold a control[ling] person liable."  *Monieson*, 996 at 859 (quoting *Harrison v. Dean Witter Reynolds, Inc*., 974 F.2d 873, 880–881 (7th Cir.1992)).

To establish, controlling person liability under Section 13(b), the Commission must show both: (1) control and (2) lack of good faith or knowing inducement of the acts constituting the violation. *Monieson*, 996 F.2d at 859; *R.J. Fitzgerald & Co*., 310 F.3d at 1334; *JCC, Inc*., 63 F.3d at 1568. To establish the first element, control, a defendant must possess specific control, which is "the power or ability to control the specific transaction or activity upon which the primary violation was predicated." *Monieson*, 996 F.2d at 859 (internal quotation marks and citation omitted). Evidence that a defendant is an officer, founder, principal, or the authorized signatory on the company's bank accounts indicates the power to control a company. *In re Spiegel*, No. CFTC No. 85-19, 1988 WL 232212, at *8 (Jan. 12, 1988); *see also Apache Trading Corp*., CFTC No. 87-14, 1992 WL 52596, at *5-6 (Mar. 11, 1992) (finding that an individual who "maintained control over the economic aspects of the operations" and "performed almost all important managerial or supervisorial functions and made all important hiring decisions" was a controlling person).

Knowing inducement requires a showing that "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *R.J. Fitzgerald & Co*., 310 F.3d at 1334; *JCC, Inc*., 63 F.3d at 1568. Controlling persons cannot avoid liability by deliberately or recklessly avoiding knowledge about potential wrongdoing. *See Monieson*, 996 at 861. To support a finding of constructive knowledge, the Commission must show that a defendant "lacked actual knowledge only because he consciously avoided it." *JCC, Inc*., 63 F.3d at 1569 (citations omitted).

A controlling person fails to act in good faith if he does not "maintain a reasonably adequate system of internal supervision and control . . . or [does] not enforce with any

32

reasonable diligence such system." *Monieson*, 996 F.2d at 860.  "The controlling person

must also act recklessly; negligence alone is not sufficient."  *Id*. (citations omitted).

      Here, Singh, Cologero, Raj, Sahdeo and Rosseau exercised direct control over their

respective CPOs, the Corporate Defendants.  They each had signatory authority over the

bank accounts that held participant funds and transferred some of those funds to either

Highrise or trading accounts.  (McCormack Decl. ¶¶ 38, 39, 54,55,59,60,76,77,89,90.94.)

They all solicited pool participants without registration and without registering their

respective associated entity.  (McCormack Decl. ¶¶ 6-15.)  Most of them sent or caused to

be sent false statements to their respective pool participants.  (McCormack Decl. ¶¶

31,32,49,52,70,87.)  By virtue of their control over their respective associated entity, there

can be no doubt that they had actual or constructive knowledge of the fraudulent and

unlawful conduct alleged in the Complaint and thus, knowingly induced their violations of

the Act and Commission Regulations.  Thus, Singh, Cologero, Raj, Sahdeo and Rosseau

controlled their respective associated entities, and they are liable for their respective

associated entity's violations of the Act and Regulations to the same extent as the Corporate

Defendants themselves.

   **B.  The Commission Has Made a Compelling Case for a Statutory Restraining
       Order**

      The Commission seeks a statutory restraining order to freeze the assets of Singh and

the Corporate Defendants and to obtain immediate access to the books and records of all the

Defendants.  The Commission seeks this relief pursuant to Section 6c(a) of the Act, 7 U.S.C.

§ 13a-1(a) (2018), and in accordance with Rule 65.

7 U.S.C. § 13a-1(a) authorizes the CFTC to seek injunctive and other relief in a district court against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

7 U.S.C. § 13a-1(a) further authorizes the Commission to seek, and the Court to grant, certain specific ex parte relief, namely

> a restraining order which [1] prohibits any person from destroying, altering, or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records or other documents[,] or [2] which prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property, and [3] . . . an order appointing a temporary receiver to administer such restraining order and to perform such other duties as the court may consider appropriate.

Mindful that notice "may result in the destruction of books and records and the dissipation of customer funds," Congress authorized courts to issue such relief ex parte in order "to prevent possible removal or destruction of potential evidence or other impediments to legitimate law enforcement activities and to prohibit movement or disposal of funds, assets and other property which may be subject to lawful claims of customers." H.R. Rep. No. 97-565, at 53-54, 93 (1982), reprinted in 1982 U.S.C.C.A.N. 3871, 3902-03, 3942

Courts in this district have granted this relief. *See CFTC v. Allied Markets LLC, et al.,* (No. 3:15-cv-5-J-34MCR) (M.D. Fla. Jan. 12, 2015) (ECF Dkt. #9) (order granting ex parte order freezing defendants' assets and prohibiting the destruction of books and records for 14 days pending a hearing on Plaintiff's Motion for a Preliminary Injunction); *CFTC v. Maverick International, Inc., et al.,* No. 3:15-cv-354-J-38MCR (M.D. Fla. Mar. 26, 2015)

(ECF Dkt. # 7) (sealed order granting ex parte statutory restraining order freezing existing and after acquired assets for a period of 14 days pending a hearing on Plaintiff's Motion for a Preliminary Injunction). *See also CFTC v. Mintline, Inc.*, No. 14-61125-CIV, 2014 WL 4050014 (S.D. Fla. May 14, 2014) (granting ex parte order freezing defendants' assets and prohibiting the destruction of books and records). Courts have also issued such restraining orders with notice to defendants. *See, e.g., CFTC v. Gibraltar Monetary Corp., Inc*., No. 04-80132-CIV, 2004 WL 7334348 (S.D. Fla. Apr. 2, 2004), *report and recommendation adopted sub nom. CFTC v. Gibralter Monetary Corp*., No. 04-80132-CIV, 2004 WL 7334349 (S.D. Fla. June 30, 2004).

As described above and in the Complaint, the Defendants are engaged in acts in violation of core provisions of the Act and Regulations.  Defendants Singh, Highrise, Cologero, Green Knight, Raj, King Royalty, Rosseau, and Bull Run have committed fraud in addition to numerous registration and disclosure requirements dictated by the Act and Regulations to protect the public.  Sahdeo and his company SR&B have solicited, at a minimum, $1.35 million from 77 individuals and funneled their funds to Highrise, where a substantial proportion of the victims' money has been misappropriated while operating without required registration.  All the Defendants have ignored the requirement to maintain their pools as separate legal entities and used the same bank accounts holding customer money to pay non-pool- related expenses.  Defendants have already solicited and accepted at least $4.75 million from over 150 commodity pool participants for forex trading.   Of that amount, Singh and Highrise traded only a combined amount of, at most, $1,656,000 in forex and misappropriated at least $3 million of pool participants' funds to pay for personal

expenses, to pay other defendants, and to make Ponzi-type payments to other pool

participants. The Commission has made a prima facie case of the violations charged in the

Complaint.   And there is a reasonable likelihood that Defendants are continuing their fraud

and other violations.

The Commission's request for a statutory restraining order with notice is necessary to

preserve the status quo.  The proposed Statutory Restraining Order with notice freezes the

assets of Singh and the Corporate Defendants, which is relief that fits squarely within the

Court's authority under the plain language of 7 U.S.C. § 13a-1(a).  An order to freeze

temporarily the assets of a defendant is often necessary to ensure that the assets will be

available to compensate public customers and is especially appropriate where, as here, the

Commission seeks disgorgement and restitution.  *See CFTC v. Levy*, 541 F.3d 1102, 1114

(11th Cir. 2008) (holding in the context of an injunction pending satisfaction of judgment

that "a district court may freeze a defendant's assets to ensure the adequacy of a

disgorgement remedy"); *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1344 (11th Cir.

2008.) ("The unqualified grant of statutory authority to issue an injunction under §  13a–1

carries with it the full range of equitable remedies, among which is the power to grant

restitution."); *CFTC v. Hunter Wise Commodities, LLC.*, No. 12-81311-CIV, 2013 WL

718503, at *10 (S.D. Fla. Feb. 26, 2013) (as a part of the authority to issue an injunction

under § 13a-1, a district court may freeze a defendant's assets to ensure the adequacy of a

disgorgement remedy), *aff'd,* 749 F. 3d 967 (11th Cir. 2014).  An order imposing a

temporary freeze of assets is often necessary simply "to preserve the status quo while an

investigation is conducted to clarify the sources of various funds." *Gibraltar Monetary*

*Corp., Inc.*, 2004 WL 7334348 at *5 (quoting *CFTC v. Morgan, Harris & Scott, Ltd.,* 484 F.

Supp. 669, 678 (S.D.N.Y. 1979)).

Moreover, an order to freeze assets temporarily is not limited to cases involving fraud

or misappropriation.  *See, e.g.*, *CFTC v. E-Metal Merchants, Inc.*, No. 1:05CV21571, 2005

WL 3741509 at * 1 (S.D. Fla. June 13, 2005) (granting ex parte statutory restraining order

where it found good cause to believe that defendants engaged in acts constituting violations

of the Act even where there were no charges of fraud or misappropriation); *Morgan, Harris*

*& Scott, Ltd.*, 484 F. Supp. at 678 ("Such an order may be appropriate wherever necessary to

ensure the preservation of funds for possible compensation to members of the public,

regardless of whether the illegal activities involved misappropriation.").

The proposed statutory restraining order with notice not only freezes the assets of

Singh and the Corporate Defendants, but also requires all Defendants to preserve certain

records and allow Commission representatives to inspect and copy such records.[11]

Preventing destruction of records is critical in this case. As described above, there is evidence

suggesting that Defendants have been engaging in their fraudulent scheme for over seven

years.  Defendants are likely in possession of records that identify all pool participants in the

---

[11] The Commission recognizes the possibility that there could be potentially privileged information or documents commingled amongst other relevant, non-privileged materials in the possession of Defendants—particularly in electronically stored information, where files are typically stored in a digital format on computer hard drives in a non-contiguous manner.  To account for this possibility, the proposed SRO provides that the Commission should undertake reasonable measures to prevent review of the Defendant's privileged communications by the Commission's attorneys and other staff who are part of the litigation team in this matter. It further provides that Defendants shall promptly contact Plaintiff's counsel to assert any claims of privilege relating to the contents of any records that are subject to this Order and promptly cooperate with Plaintiff's counsel to develop reasonable protocols to isolate and prevent disclosure of claimed privileged materials to the Commission's attorneys and other staff who are part of the litigation team in this matter.  However, the proposed Statutory Restraining Order specifically states that none of the above-described provisions excuse the Defendants from full and immediate compliance with the Statutory Restraining Order permitting Plaintiff to inspect the books and records.

Highrise Master Pool as well as the Feeder Pools, the amounts contributed by each pool participant and the dates of those contributions, as well as other records that establish the scope, duration, and operation of this fraudulent scheme.  Given that these critical documents are all in the possession of Defendants, and that Defendants can easily destroy these, the Commission needs an order preserving these records and making them accessible at the outset of this litigation.  *See CFTC v. Brown*, No. 3:15-CV-354-BJD-MCR, 2015 WL 10963747, at *2 (M.D. Fla. Apr. 8, 2015) (finding good cause for entry of an order restraining defendants and relief defendants from destroying records and allowing CFTC to inspect and copy records).  Absent immediate access, Defendants would have an opportunity to frustrate Commission efforts to identify victims of the fraud, hold Defendants liable for the full extent of their wrongdoing, and provide redress to all victims of Defendants' fraud. The Commission also requests authority to copy the records (with the records being returned to Defendants afterwards) as part of the order requiring preservation and allowing inspection of the records.

Although 7 U.S.C. § 13a-1(a) does not expressly provide for copying of records, such authority is necessary to give practical meaning to the Commission's right to inspect.  "The law has long recognized that the "authorization of an act also authorizes a necessary predicate act."  *Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring in the judgment) (quoting A. Scalia & B. Garner, Reading Law:  The Interpretation of Legal Texts 192 (2012) (discussing the "predicate-act canon")); *see also id.* ("'[W]henever a power is given by a statute, everything necessary to the making of it effectual or requisite to attain the end is implied'" (quoting 1 J. Kent, Commentaries on American Law 464 (13th ed.

1884))); *cf. McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 409–10 (1819) ("The government which has a right to do an act, and has imposed on it, the duty of performing that act, must, according to the dictates of reason, be allowed to select the means . . . ."). A provision authorizing the Commission to copy records is a necessary predicate to the Commission's ability to inspect that will ensure important records related to Defendants' relevant conduct and customer funds are not destroyed and allow Commission representatives to have a real and meaningful opportunity to inspect, review, and carefully analyze all such records. Such relief is consistent with the strong policy enunciated by Congress, "to prevent any possible destruction of evidence and conversion of assets." H.R. Rep. No. 97-565, at 53–54. This relief is particularly appropriate here given that Defendants are not registered with the Commission and therefore are under no regulatory obligation to maintain records that may be material to determining the full extent of the violative conduct. Numerous courts have previously authorized copying of records even in ex parte circumstances. *See, e.g.*, *CFTC v. Oasis Int'l Group, Ltd. et. al*, No. 8:19-cv-00886-VMC-SPF, ECF Dkt. No. 7 (M.D. Fla. April 15, 2019)*; CFTC v. Fin. Tree,* No. 2:20-CV-01184-TLN-AC, 2020 WL 3893390, at *11 (E.D. Cal. July 2, 2020); *CFTC v. Khara*, No. 15 cv 03497, 2015 WL 10849125, at *4 (S.D.N.Y. May 5, 2016); *CFTC v. RFF GF, LLC*, No. 4:13–cv–382, 2013 WL 4083748, at *4 (E.D. Tex. Jul. 9, 2013); *CFTC v. Vishnevetsky*, No. 1:12–cv–03234, 2012 WL 2930302, at *3 (N.D. Ill. May 1, 2012).[12]

---

[12] The proposed statutory restraining order with notice also contains various provisions related to ensuring the effectiveness of the asset freeze and inspection and preservation of records, such as ones requiring defendants to identify the location of, and necessary passwords to access, the records, one giving notice to financial institutions about the asset freeze, and one allowing a designated law enforcement official to assist the CFTC staff with service of process and maintain lawful order.

Although the evidence here warrants an *ex parte* statutory restraining order, because Plaintiff's counsel has been in contact with counsel for two of the Defendants, Green Knight and Cologero, it intends to provide notice of the instant motion to all Defendants, if possible, immediately after filing and assignment of the case.

### C.  Preliminary Injunctive Relief is Necessary and Appropriate

Pursuant to Section 6c(a) and (b) of the Act, 7 U.S.C. § 13a-1, (b) (2018), the CFTC also seeks a preliminary injunction continuing the emergency relief in the statutory restraining order and prohibiting, among other things, any future violations of the Act and Regulations under which Defendants have been charged.

The CFTC is entitled to preliminary injunctive relief under Section 6c of the Act, 7 U.S.C. § 13a-1(2018), upon a *prima facie* showing that (1) a violation has occurred and (2) there is a reasonable likelihood of future violations.  *Hunter Wise Commodities, LLC,* 749 F. 3d at 974.  "A court deciding whether to issue a preliminary injunction under the Act does not employ the familiar preliminary injunction formula, which requires that a plaintiff clearly establish a substantial likelihood of success on the merits and the likelihood of irreparable injury, among other things."  *Id*., *see also Brown*, 2015 WL 10963747, at *2 ("In actions for a statutory injunction, the agency need not prove irreparable injury or the inadequacy of other remedies as required in private injunctive suits.") (citation omitted).  The Court may infer a reasonable likelihood of future violations based on Defendants' past unlawful conduct.  *See CFTC v. Capital Blu Mgmt., LLC*, No. 6:09-CV-508-ORL-28, 2011 WL 2357629, at *4 (M.D. Fla. June 9, 2011) (in analyzing the "reasonable likelihood" part of the test, the district court may infer likelihood of future violations from a defendant's past violations) (citing

*CFTC v. Am. Bd. of Trade, Inc*., 803 F.2d 1242, 1244 (2d Cir. 1986)); *CFTC v. British American Commodity Options Corp,* 560 F.2d 135, 142 (1977), *cert. denied* 438 U.S. 905 (1978)( a prima facie showing that defendant was violating the registration requirements of Section 6m of the Act is enough for preliminary injunctive relief, even in the absence of a showing of fraud.)

The record before the Court establishes that Defendants have engaged, are engaging in, or are about to engage in acts or practices constituting violations of provisions of the Act and Regulations.   Highrise issued monthly account statements which misrepresented the profits and balances of the pool participants' respective interests in the Master Pool and misappropriated pool participant funds.   Green Knight, Bull Run, and King Royalty likewise each issued monthly account statements to their pool participants that misrepresented the profits and balances of the pool participants' respective interests in the Feeder Pools, as well as the Master Pool.   SR&B funneled at least $1,350,000 to Highrise for forex trading while operating in an illegal manner by not registering as a CPO and not operating its commodity pool as a legal entity separate from the pool operator.   All of the Defendants failed to register with the CFTC as CPOs or their respective APs while operating forex pools.   Accordingly, injunctive relief is necessary and appropriate.

## VI.     CONCLUSION

In light of the strong likelihood of ongoing fraud committed by Defendants and the need to protect their victims, the Commission respectfully requests the Court enter a Statutory Restraining Order with notice (1) freezing the assets of Defendants Singh, Highrise, Green Knight, King Royalty, SR&B and Bull Run; (2) preventing all Defendants from destroying

Case 6:20-cv-01657-CEM-GJK   Document 6   Filed 09/09/20   Page 49 of 49 PageID 170

any records; and (3) permitting the Commission to inspect and copy Defendants' records and requiring Defendants to provide information necessary to locate and access those records.

Further, the CFTC requests that after an opportunity for a hearing, the Court issue a Preliminary Injunction against Defendants that continues relief granted by the Statutory Restraining Order, requires that the Defendants provide the CFTC with a full accounting of their assets and preliminarily enjoins the Defendants from violating the provisions of the Act and Regulations charged against them in the Complaint.

Dated:  September 9, 2020                 Respectfully Submitted,

**COMMODITY FUTURES
TRADING COMMISSION**

By: /s/ Cristina Covarrubias

Cristina Covarrubias (Trial Counsel)
(appearing pursuant to Local Rule
2.02(b))
Susan B. Padove
(appearing pursuant to Local Rule
2.02(b))
Elizabeth M. Streit
(appearing pursuant to Local Rule
2.02(b))
Scott R. Williamson (appearing
pursuant to Local Rule 2.02(b))

Attorneys for Plaintiff
Commodity Futures Trading
Commission
525 W. Monroe St
Chicago, IL 60661
Tel. (312) 596-0700
Fac. (312) 596-0714
*ccovarrubias@cftc.gov*
*spadove@cftc.gov*
*estreit@cftc.gov*
*swilliamson@cftc.gov*